### IN RE: ADOPTION OF J.N.M., a Minor

### Appeal of: L.M.W., Mother

### In re: Adoption of C.R.S.J., a Minor

### Appeal of: L.M.W., Mother

No. 1130 WDA 2017
No. 1131 WDA 2017

Superior Court of Pennsylvania.

Submitted November 27, 2017
Filed January 8, 2018

---

Randall G. Klimchock, Mount Pleasant, for appellant.

Dorean N. Petonic, Scottdale, for J.N.M.

John A. Cochran, Greensburg, for C.R.J., participating party.

Judith Karns-Ciszek, Greensburg, for J.M., participating party.

Steven R. Allias, New Kensington, for P.M., participating party.

Zachary I. Mesher, West Newton, for S.J., participating party.

Debra M. Nicholson, Greensburg, for Westmoreland County Children's Bureau, participating party.

BEFORE: OLSON, DUBOW, and STRASSBURGER,* JJ.

OPINION BY STRASSBURGER, J.:

L.M.W. (Mother) appeals from the orders entered on June 30, 2017, involuntarily terminating her parental rights to J.N.M., born in August 2008, and C.R.S.J., born in December 2005 (Children, collectively). We affirm.

We summarize the findings of fact made by the orphans' court as follows. On October 2, 2014, Westmoreland County Children's Bureau (WCCB) removed Children, then ages eight and six, from Mother, and took them into emergency custody. Juvenile court later adjudicated Children dependent pursuant to the Juvenile Act, 42 Pa.C.S. §§ 6301–6375. The circumstances that necessitated the removal and dependency relating to Mother were deplorable conditions in Mother's home, outstanding warrants for Mother's arrest on three separate criminal charges, a history of domestic violence in Mother's home and in Children's presence, and Mother's drug abuse.

After their removal, Children were placed in a foster home for one month before moving into a kinship foster home with J.N.M.'s paternal great aunt. In June 2015, after the great aunt requested Children's removal, Children moved to a pre-adoptive foster home, where they remained at the time of the termination hearings.

During the almost three years that Children were in foster care, Mother made little to no progress in rectifying the condi-

* Retired Senior Judge assigned to the Superior Court.

tions that brought Children into care.[1] Mother never had a residence of her own; she has been either homeless, incarcerated, or residing with a paramour (including at least one with whom the relationship was fraught with domestic violence). In December 2014, Mother overdosed on drugs, resulting in her hospitalization. Mother attempted drug and alcohol treatment several times, but never completed a program successfully. Mother also was unsuccessfully discharged from mental health treatment. She often missed drug screens, and also repeatedly refused to undergo screens or tested positive for alcohol and/or illegal drugs.

Mother's criminal troubles intensified during the time Children were in foster care. Mother missed visits with Children to avoid being picked up on warrants. Mother was arrested four times, resulting in a brief incarceration the first three times, and, finally, her current incarceration, which commenced on October 13, 2016. Mother entered a negotiated guilty plea for use/possession of drug paraphernalia in April 2017, and was sentenced to one year of probation. On June 29, 2017, Mother was sentenced to an aggregate term of four-and-a-half to ten years' imprisonment due to burglary and criminal trespass convictions. At the time of the termination of parental rights (TPR) hear-

ings, Mother had five probation revocation hearings pending due to these convictions as well as pending criminal charges for retail theft.

Although Mother had the opportunity to visit Children anywhere from twice a week to twice a month throughout their dependency, she attended slightly under half of the visits offered. On multiple occasions, Mother did not see Children for weeks or months at a time, with the longest gap lasting three months. Children have visited Mother in prison occasionally, but they were unable to visit for six weeks due to restrictions resulting from Mother's conduct in prison. When Mother visited Children prior to her incarceration, she sometimes appeared to be under the influence of drugs; she was uncooperative, incoherent, and nodded off, all of which impaired her ability to care for Children during the visit or receive parenting instruction.

Based upon Mother's lack of progress, WCCB filed petitions to terminate involuntarily Mother's parental rights to Children in February 2017. After appointing separate counsel for each child to represent their legal interests and Children's dependency guardian ad litem to represent their best interests, the orphans' court presided over two hearings in June 2017.[2] Six wit-

---

1. The orphans' court found that Mother made minimal to no progress at every permanency review hearing. Orphans' Court Opinion, 8/24/2017, at 5. According to Children's permanency review orders, this finding is correct, except Mother did achieve moderate progress at the April 2016 hearing. WCCB Ex. 4. Nevertheless, this level of progress was short lived, as the juvenile court determined that Mother had achieved no progress at the permanency review hearings in October 2016 and April 2017. *Id.*

2. Children's guardian ad litem and counsel join WCCB's brief advocating for this Court to

affirm the termination decrees. We note that based upon the evidence in the record and statements by the attorneys at the hearing, it appears that Children have had shifting feelings and positions regarding termination of parental rights. *See, e.g.,* WCCB Ex. 2; N.T., 6/1/2017, at 22, 31, 33, 35–36, 109, 148, 160–165; N.T. 6/29/2017, at 58–64. For most of their dependency, Children have wished to be reunified with Mother; at other times, perhaps after realizing Mother was going to be incarcerated for a long period, they have wished to remain in their foster care placement. Regarding adoption, Children have

nesses testified, including Mother; Mother's probation officer; Carol Hughes, a psychologist who conducted an evaluation of Children regarding their ability to bond; Kathy Menzler, who supervised visits and offered parenting instruction; Robert Gamble, the family's WCCB caseworker; and C.R.S.J.'s father. On June 30, 2017, the orphans' court terminated Mother's parental rights to Children.[3] This appeal followed.[4]

Mother presents six questions for this Court's consideration, which we have reordered for ease of disposition.

[1.] Whether the [orphans'] court erred in finding by clear and convincing evidence that the moving party met its burden as to terminating the parental rights of Mother under 23 Pa.C.S. § 2511(a)(2).

[2.] Whether the [orphans'] court erred in finding by clear and convincing evidence that the moving party met its burden as to terminating the parental rights of Mother under 23 Pa.C.S. § 2511(a)(5).

[3.] Whether the [orphans'] court erred in finding by clear and convincing evidence that the moving party met its burden as to terminating the parental

rights of Mother under 23 Pa.C.S. § 2511(a)(8).

[4.] Whether the [orphans'] court erred in terminating Mother's parental rights despite the lack of a bonding assessment in the record or testimony.

[5.] Whether the [orphans'] court erred in terminating Mother's parental rights when less drastic options, such as subsidized permanent legal custodianship [ (SPLC) ], were available, and would not require Children to suffer the sense of loss and grief accompanying an order of termination.

[6.] Whether the [orphans'] court erred in finding by clear and convincing evidence that the moving party met its burden under 23 Pa.C.S. § 2511(b) that the best interests of Children are met by terminating Mother's parental rights.

Mother's Brief at 4 (suggested answers and unnecessary capitalization, articles, and emphasis omitted).

■ We begin with our standard of review.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the

---

been ambivalent and/or willing to be adopted by foster parents if reunification did not occur.

At the conclusion of the hearing, the orphans' court asked all parties to make a closing summary and requested counsel for Children to set forth Children's respective positions. N.T., 6/29/2017, at 54, 59–62. Counsel for J.N.M. struggled to articulate J.N.M.'s precise position and stated her belief that she could not set forth J.N.M.'s statements to her when representing J.N.M.'s position because "of a hearsay problem." *Id.* at 59. We remind counsel that just as if J.N.M. were an adult client, counsel may convey J.N.M.'s statements in setting forth her position (assuming J.N.M. does not wish for them to be protected by attorney-client privilege) because the statements are neither being admitted into evi-

dence nor being accepted for the truth of the matter asserted. Counsel also indicated that prior to the hearing, she had "heard [C]hildren were coming" to the hearing and later "heard [Children were not] coming," and she was unclear about the nature of her obligations to J.N.M. *Id.* Again, we remind counsel while children are not required to attend TPR hearings or testify, if counsel believes that having her client testify would advance her client's position, it is her duty to arrange for her client to do so.

3. The orphans' court also involuntarily terminated the parental rights of Children's respective fathers. Neither father has filed his own appeal or participated in this appeal.

4. Both Mother and the orphans' court complied with Pa.R.A.P. 1925.

trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 620 Pa. 602, 71 A.3d 251, 267 (2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101–2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [subs]ection 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [subs]ection 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007).

Here, the orphans' court determined that WCCB met its burdens under subsections (a)(2), (a)(5), and (a)(8) of 23 Pa.C.S. § 2511. In her brief, Mother concedes that her incarceration precludes her from being immediately available to care for Children.[5] Mother's Brief at 17. Nevertheless, Mother argues that WCCB failed to prove the elements of subsection 2511(a)(2), because she may qualify for a boot camp program, which would allow her to return to the community and remedy her unavailability to parent within a reasonable period.[6] *Id.* She offers no argument regarding subsection (a)(5) and (a)(8) other than claiming WCCB failed to prove that terminating Mother's parental rights serves Children's needs and welfare.

■ We hold that Mother has waived her challenge to the orders terminating her parental rights regarding subsection 2511(a). Mother fails to cite to relevant authority and her argument spans only seven sentences. *See In re W.H.*, 25 A.3d 330, 339 n.3 (Pa.Super. 2011) (quoting *In re A.C.*, 991 A.2d 884, 897 (Pa.Super. 2010)) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived.").

■ Even if Mother did not waive her challenge pursuant to subsection 2511(a),

---

**5.** Mother claims in her brief that her sentence is four to eight years. However, Mother testified that her aggregate sentence is four-and-a-half years to ten years of incarceration. N.T., 6/29/2017, at 17.

**6.** Mother fails to mention that the orphans' court, who is the final arbitrator of credibility, found Mother's testimony regarding her potential eligibility for early release to be neither credible nor persuasive. *See* Orphans' Court Opinion, 8/24/2017, at 5.

we would conclude that WCCB demonstrated grounds to terminate Mother's parental rights pursuant to subsection 2511(a)(8). "While the trial court found that [the agency] met its burden of proof under each [sub]section [referenced] above, we need only agree with its decision as to any one subsection in order to affirm the termination of parental rights." *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004). In order to satisfy subsection 2511(a)(8), WCCB must show (1) that the child has been removed from the care of the parent for at least twelve (12) months; (2) that the conditions which had led to the removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child. 23 Pa.C.S.A. § 2511(a)(8). Termination under subsection 2511(a)(8) does not require an evaluation of a parent's willingness or ability to remedy the conditions that led to placement of his or her children. *See In re M.A.B.*, 166 A.3d 434, 446 (Pa. Super. 2017).

■ Children have been removed from Mother's care for almost three years. At the time Children came into care, the family was exposed to deplorable conditions in Mother's home and domestic violence, and Mother was abusing drugs and had outstanding warrants for her arrest. It is clear that despite the passage of almost three years, Mother failed to remedy the conditions that brought Children into care. Mother's criminal troubles continue and she is sentenced to incarceration until January 2019 at a minimum. Moreover, Mother has failed to complete any treatment programs and stay sober outside of prison. Prior to going to prison, she continued to struggle with her mental health and be involved in relationships with domestic violence. Mother never obtained stable housing. She also visited inconsistently, and when she did visit, she often exhibited unstable behavior. Finally, termination best serves Children's needs and welfare for the same reasons discussed infra regarding subsection 2511(b). Therefore, the orphans' court did not err by terminating Mother's parental rights pursuant to subsection 2511(a)(8).

We turn now to Mother's arguments pursuant to subsection 2511(b).

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1) ... or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

We have explained the analysis under this subsection as follows.

[Subs]ection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, [sub]s]ection 2511(b) does not explicitly require a bonding analysis and the term "bond" is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when

determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quotation marks and citations omitted).

When examining the effect upon a child of severing a bond, courts must examine whether termination of parental rights will destroy a "necessary and beneficial relationship," thereby causing a child to suffer "extreme emotional consequences." *In re E.M.*, 533 Pa. 115, 620 A.2d 481, 484–85 (1993). In the case of an unhealthy bond, "attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and we must weigh that injury against the damage that bond may cause if left intact." *In re T.S.M.*, 620 Pa. 602, 71 A.3d 251, 267 (2013).

In the instant case, the orphans' court acknowledged Children's strong bond and attachment to Mother, but concluded that termination best serves Children's needs and welfare due to the unhealthy and inappropriate nature of the relationship. Orphans' Court Opinion, 8/24/2017, at 12–13. The court also emphasized Children's sta-

bility in their most recent foster home and the effect upon Children of Mother's failure to rectify her parenting issues and lifestyle instability. *Id.* at 13.

In response, Mother argues that severing the strong bond between Mother and Children is not in Children's best interest and the conclusion of the orphans' court to the contrary is unsupported by the record.[7] Mother's Brief at 14. Mother emphasizes the lack of a formal bonding assessment and testimony from Ms. Hughes, WCCB's expert in psychology, conceding that she does not have any way to assess or predict the level of grief and loss Children will suffer upon termination. *Id.* at 14–15. Mother also contends that Ms. Menzler, the supervisor of visits, is not qualified to assess bonding and therefore, the orphans' court should not have relied upon her lay opinion that the bond between Children and Mother is unhealthy. *Id.* Finally, Mother argues that subsidized permanent legal custodianship is a more appropriate outcome for Children based upon their ambivalence towards adoption and the grief and loss they would suffer if their relationship with Mother were severed. *Id.* at 15–17.

Regarding Mother's contention that the orphans' court erred by terminating rights without a bonding assessment between Children and Mother and Children and their foster parents, this Court has held that "the orphans' court is not required by statute or precedent to order a formal bonding evaluation be performed by an expert." *In re K.K.R.–S.*, 958 A.2d 529, 533 (Pa. Super. 2008). While it may be "wise" to conduct a "bonding evaluation" where there is evidence of a bond, in other

---

**7.** Although Mother purports to present three separate issues regarding needs and welfare, she combines the issues into one subsection of her argument. *See* Mother's Brief at 14–17.

We remind Mother that the argument must be divided into as many parts as there are questions to be argued. Pa.R.A.P. 2119(a).

cases "direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." *In re K.Z.S.*, 946 A.2d 753, 762–63 (Pa. Super. 2008). Furthermore, the orphans' court is free to rely upon the assessments of social workers and case-workers. *In re M.A.B.*, 166 A.3d 434, 444 (Pa. Super. 2017). Therefore, the orphans' court did not err in this case by relying upon the opinion of Ms. Hughes, who interviewed Children regarding their feelings about Mother and their foster parents, and the testimony of Ms. Menzler, who described her observations regarding the interactions between Children and Mother at supervised visitation throughout Children's time in foster care.

■ Turning to Mother's remaining arguments, we note that none of the parties disputes the existence of a strong bond between Mother and Children. Thus, the pertinent issue is the health of the bond and the effect of severing the bond. To support its conclusion regarding the unhealthy nature of Children's bond with Mother, the orphans' court cited Ms. Menzler's description of a particularly problematic visit. Orphans' Court Opinion, 8/24/2017, at 12 (citing N.T., 6/1/2017, at 78–81). According to Ms. Menzler, Mother called a drug and alcohol clinic to set up transportation to get medication. N.T., 6/1/2017, at 78. In response to the clinic's notifying Mother that there would be a delay, Mother said, in the presence of Children, that she would just start to use heroin again and kill herself. *Id.* Later in the same visit, Mother cried while speaking to Children. *Id.* When Mother left the room, C.R.S.J. told Ms. Menzler that he did not want to see Mother anymore, but he was afraid to tell her. *Id.* at 79. J.N.M. worried that she would not see Mother, but Ms. Menzler assured her she would. *Id.* When Mother returned to the room,

Mother told Children that if she did not get them back, she "would kill herself in front of everybody." *Id.* She also told Children that WCCB was going to separate them and they would not be adopted together. *Id.*

The orphans' court next turned its attention to the effect Mother's behavior has had on Children. Orphans' Court Opinion, 8/24/2017, at 12–13. Once again, Ms. Menzler's observations are instrumental. Specifically, Ms. Menzler

testified that as early as October 2014, at the inception of [Children's] dependency, she already observed by [Children's] care and concern for Mother's well[-]being that the parent-child roles between them were perversely reversed, as if [Children] were the parent. Since [Children's] adjudication at the [ages of six and eight], this role reversal has only been further solidified by Mother's actions and shortcomings throughout the dependency. The perversion is so complete, in fact, that [Children's] concerns for Mother's well-being have actually been alleviated by Mother's incarceration, because, at least in prison, [Children know] Mother is safe, sheltered and fed.

*Id.* (citations omitted). Ms. Menzler offered multiple examples to support her conclusion regarding the unhealthy role reversal. N.T., 6/1/2017, at 81, 110–12. Furthermore, Ms. Menzler's observations regarding the role reversal is consistent with Ms. Hughes' interviews of Children. For example, Ms. Hughes believes that J.N.M. feels insecure in her relationship with Mother because she worries Mother "may not have a place to live or to shower or to have food," which indicates that J.N.M. is concerned Mother is unable to meet J.N.M.'s needs as well. N.T., 6/1/2017, at 22, 49–50.

During Ms. Hughes' interviews of Children, they both expressed a desire to re-

turn to Mother, anger and sadness about their inability to do so, and a psychological sense of belonging with Mother. *Id.* at 19, 21–22, 31, 35–36. Nevertheless, in Ms. Hughes' opinion, Children have begrudgingly accepted that they may not return to Mother. *Id.* at 35–36. While this makes them sad, they also recognize "they are okay where they are [ ]." *Id.* Both Children also expressed feeling safe and happy in their foster home and recognized that their foster parents meet their needs. *Id.* at 20–24, 31, 33. In fact, C.S.R.J. said the thing he was most proud of was being "in a safe family." WCCB Ex. 2 at 3.

Ms. Hughes noted that Children are doing well emotionally, behaviorally, cognitively, physically, and socially, and believes that terminating Mother's rights would not disrupt Children's development across the domains of their lives. N.T., 6/1/2017, at 20, 26–27. Ms. Hughes does believe that Children will suffer grief and loss if Mother's rights are terminated. *Id.* at 20. She is not able to predict the exact level, but believes their grief and loss could be addressed therapeutically. *Id.* at 48, 53. Since Children have been doing well in foster care notwithstanding their extended separation from Mother, Ms. Hughes does not believe Children's social, emotional, behavioral, and educational development will be "significantly impact[ed]" if the relationship with Mother is permanently severed.[8] *Id.* at 39, 47. Furthermore, based upon the multiple disruptions in Children's relationships with prior caregivers, she also supports Children remaining with their current foster parents, who offer them stability. *Id.* at 24–25.

Therefore, the record supports the conclusion that the bond between Mother and Children is unhealthy. Furthermore, despite the strong bond with Mother and some negative impact to Children by terminating her parental rights, there is no indication in the record that Children will "suffer extreme emotional consequences" if the relationship is severed. *E.M.*, 620 A.2d at 485. Based on the foregoing testimony from Ms. Hughes and Ms. Menzler, the orphans' court did not err by prioritizing Children's safety and security needs over their relationship with Mother. *See In re Coast*, 385 Pa.Super. 450, 561 A.2d 762, 771 (1989) (en banc) (permitting trial courts to consider the totality of the circumstances when performing a needs and welfare analysis); *In re M.M.*, 106 A.3d 114, 119 (Pa. Super. 2014) (determining that the detriment to the children in severing their bond with mother was outweighed by their safety and security needs).

Finally, Mother argues that the orphans' court erred by terminating parental rights instead of changing Children's permanency goal to SPLC.[9] There is no indication that any party petitioned the juvenile court to

---

8. We note this is the case despite irregular contact with Mother. *Id.* at 109.

9. SPLC is one of the permanency goals the juvenile court may consider at each permanency review hearing. 42 Pa.C.S. § 6351(f.1)(3). This Court has explained SPLC as follows.

> In 2001, Pennsylvania created a subsidy program, SPLC, which provides financial support for families willing to become permanent legal custodians pursuant to [42 Pa.C.S. § 6351(f.1)(3) ]. SPLC transfers permanent legal custody to the [dependent] child's legal custodian without requiring the termination of ... parental rights. When deemed appropriate, the trial court has the power to permit continued visitation by the [dependent] child's ... parents. To be eligible for SPLC, the legal custodian must meet all of the requirements for foster parenthood, submit to an annual eligibility evaluation, and have the ability to provide for the child without court supervision.

*In re B.S.*, 861 A.2d 974, 977 (Pa. Super. 2004). Alternative permanency arrangements such as SPLC offer less stability than adoption because parents may petition the court to

change Children's permanency goal to SPLC; the goal remained reunification with a concurrent goal of adoption at the time of the termination proceedings. WCCB Ex. 4. Mother did not appeal any orders emanating from the juvenile court in Children's dependency; all that is before us is the propriety of the orphans' court orders terminating parental rights. Although permanency goals and termination proceedings are interrelated, they are separate legal issues. *In re R.I.S.*, 614 Pa. 275, 36 A.3d 567, 575 (2011). We may not decide an issue that is not properly before us. Furthermore, even if this issue were before us, for the reasons stated supra, the orphans' court did not abuse its discretion by concluding that termination best serves Children's needs and welfare.

Cases in which reunification is not viable but there is a strong parent-child bond are certainly amongst the most difficult. Nevertheless, the record supports the findings of the orphans' court and we discern no abuse of discretion in terminating Mother's parental rights.

Orders affirmed.

attempt to re-gain custody at any time, but SPLC may be appropriate in cases where reunification or adoption is not in the best interest of the child. *See In re S.H.*, 71 A.3d 973, 978 (Pa. Super. 2013).