J-S44015-19

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

IN THE INTEREST OF: S.J., A MINOR :   IN THE SUPERIOR COURT OF
                                    :          PENNSYLVANIA
                                    :

APPEAL OF: S.F., BIRTH MOTHER    :
                                    :
                                    :
                                    :
                                    :
                                    :   No. 532 WDA 2019

Appeal from the Order Entered March 15, 2019
In the Court of Common Pleas of Allegheny County Civil Division at
No(s): No. CP-02-AP-168-2018

BEFORE: SHOGAN, J., McLAUGHLIN, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY SHOGAN, J.:                 FILED OCTOBER 7, 2019

S.F. ("Mother") appeals from the order filed on March 15, 2019, involuntarily terminating her parental rights to her daughter, S.J. ("Child"), who was born in August of 2005, pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b).[1]  We affirm.

The record reveals that Child was removed from Mother's care on January 24, 2017, when Child suffered an injury to her head.  The injury was caused when Mother threw a coffee cup at Child.  The cup struck Child in the head, lacerating her scalp and requiring two staples to close the wound.  Mother was arrested as a result of this incident.  N.T., 3/6/19, at 94-95.  On

_____

[1] Child's father died on June 1, 2007.  Trial Court Opinion, 5/10/19, at 1; N.T., 3/6/19, at 49; Supplement To The Petition For Involuntary Termination Of Parental Rights (Exhibit – B) Certificate of Death, 2/13/19.

August 22, 2018, the Allegheny County Office of Children, Youth, and Families ("CYF") filed a petition to involuntarily terminate Mother's parental rights.

On March 6, 2019, and March 13, 2019, the trial court conducted hearings on CYF's petition. At these hearings, Jeffrey Eisenberg, Esquire, represented Mother, and James J. Robertson, Esquire, represented Child.[2]

CYF first presented the testimony of Child's foster mother, J.M., ("Foster Mother"), via telephone. N.T., 3/6/19, at 4. Foster Mother testified to Child's fear during an incident when Child was visiting Mother on Thanksgiving of 2018. Id. at 9, 12. During this incident, Mother's paramour, R.H., punched Mother in the chest in front of Child. Id. at 12. Foster Mother also testified that she believed that Mother had been drinking alcohol. Id. at 12. Further,

_____

[2] In In re Adoption of L.B.M., 161 A.3d 172 (Pa. 2017), our Supreme Court held that 23 Pa.C.S. § 2313(a) requires courts to appoint counsel to represent the legal interests of any child involved in a contested involuntarily termination proceeding. L.B.M., 161 A.3d at 180. The Court explained that a child's legal interests are distinct from her best interests. Id. at 174. A child's legal interests are synonymous with the child's preferred outcome; a child's best interests must be determined by the court. Id. at 174-175. It appears from the record that Courtney Potter, Esquire, served as Child's Guardian Ad litem ("GAL") in prior proceedings. Motion for Appointment of Separate Counsel, 2/7/19. In the GAL's motion for the appointment of separate counsel, she noted a potential conflict between Child's best interests and legal interests. Id. at ¶4. On February 12, 2019, the trial court granted the GAL's motion, and on February 13, 2019, James J. Robertson, Esquire, entered his appearance as legal counsel for Child. Attorney Robertson has filed a brief in this Court stating that Child, who was thirteen at the time of the hearings, took no position regarding termination of Mother's parental rights and instead wanted the trial court to decide the matter without Child's input. See Child's Brief, at 2-3 (citing N.T., 3/13/19, at 21).

when Child attempted to join Mother at Child's maternal grandmother's house in December of 2018 for Christmas, Mother upset Child by blaming Child for "f'ing everything up" and "ruining everything." Id. at 10, 40. As a result of this December 2018 incident, Child's visits with Mother became supervised and occurred only once per week. Id. at 7-8, 10-11. Foster Mother testified that Child is concerned about the constant court involvement in her life and that Child is unwilling to take a position on whether she wishes to be adopted because she is concerned about Mother's reaction. Id. at 13-15. Foster Mother stated that Child carries guilt over her fear that Mother could relapse into alcohol abuse or kill herself if her parental rights are terminated. Id. at 14-15. Foster Mother testified that Child had been cutting herself and contemplating suicide, which led to Foster Mother taking Child to the Western Psychiatric Hospital. Id. at 15-17. Child was hospitalized, and she was released from the hospital on the day prior to the hearing. Id.

CYF then presented the testimony of Neil Rosenblum, Ph.D., a psychologist licensed in Pennsylvania, who testified as an expert in child psychology. Id. at 43-44. Dr. Rosenblum opined that a Subsidized Permanency Legal Custodianship ("SPLC") was appropriate in this case. N.T., 3/6/19, at 80.[3] He noted that Mother is serving a criminal sentence of

_____

[3] In In re Adoption of J.N.M., 177 A.3d 937, 946 n.9 (Pa. Super. 2018), this Court stated that SPLC is one of the permanency goals the juvenile court may consider at each permanency review hearing. 42 Pa.C.S. § 6351(f.1)(3).

probation until October of 2019. Id. at 55. Dr. Rosenblum testified that Mother continued to live with R.H. as a roommate, but Mother represented that she would be moving into an apartment without R.H. on April 1, 2019. Id. at 56-57. He also stated that the loss of Mother from Child's life could cause trauma to Child. Id. at 60-62.

Next, CYF presented the testimony of Lindsey Hern, the CYF caseworker assigned to the family. N.T., 3/6/19, at 93. Ms. Hern testified that Mother's goals included visiting Child, maintaining sobriety, addressing her involvement in relationships with domestic violence, and improving her parenting skills. Id. at 96-98. Ms. Hern testified that although Mother claimed she had attended Alcoholics Anonymous, she had not provided proof of her attendance. Id. at 101, 104, 123. Mother also failed to provide

_____

SPLC is a program that was created in 2001, in which financial support is provided to families willing to become permanent legal custodians under 42 Pa.C.S. § 6351(f.1)(3), whereby permanent legal custody is transferred to the dependent child's legal custodian without requiring the termination of the parents' parental rights, and, where deemed appropriate, the trial court may permit the continued visitation by the dependent child's parents. J.N.M., 177 A.3d at 946 n.9 (quoting In re B.S., 861 A.2d 974, 977 (Pa. Super. 2004)). The legal custodian must meet all of the requirements for foster parenthood, submit to an annual eligibility evaluation, and have the ability to provide for the child without court supervision. The panel in J.N.M. stated that alternative permanency arrangements such as an SPLC offer less stability than adoption because parents may petition the court to attempt to re-gain custody at any time, but an SPLC may be appropriate in cases where reunification or adoption is not in the best interest of the child. J.N.M., 177 A.3d at 946 n.9 (citing In re S.H., 71 A.3d 973, 978 (Pa. Super. 2013)).

documentation of her attendance at psychological counseling or evidence of treatment for alcohol abuse. Id. at 101, 104, 124-125.

Finally, Mother testified. N.T., 3/6/19, at 146. Mother claimed that she was no longer romantically involved with R.H., and the two were merely roommates. Id. at 156, 158, 178. Mother testified she has remained sober since a relapse in April of 2018. Id. at 163-165. Mother confirmed that she remains on probation until October of 2019. Id. at 170. Mother testified that she found an apartment but had not yet signed a lease. Id. at 157. Mother also asserted that she sent CYF certificates demonstrating her completion of classes regarding parenting skills and that she wants to be a parent to Child. Id. at 169, 175.

On March 13, 2019, the trial court held a second day of evidentiary hearings at which CYF presented additional testimony of Foster Mother. N.T., 3/13/19, at 5. Foster Mother testified that Child had admitted smoking marijuana and drinking beer with her maternal cousins when she visited Mother's family. Id. at 5-8, 13. Foster Mother expressed her concerns about such behavior if Child is permitted to visit Mother. Id. at 6.

On March 15, 2019, the trial court involuntarily terminated Mother's parental rights to Child pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b). On April 11, 2019, Mother timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to

Pa.R.A.P. 1925(a)(2)(i) and (b).  On May 10, 2019, the trial court filed an

opinion pursuant to Pa.R.A.P. 1925(a)(1).

In her brief on appeal, Mother raises the following issues:

1. Did the trial court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), and (8)?

2. Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of [Child] pursuant to 23 Pa.C.S. § 2511(b)?

Mother's Brief, at 5.

In reviewing an appeal from an order terminating parental rights, we

adhere to the following standard:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights.  As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record.  In re: R.J.T., 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010).  If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion.  Id.; R.I.S., [614 Pa. 275, 284,] 36 A.3d 567, 572 (Pa. 2011) (plurality opinion)].  As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion.  Id.; see also Samuel Bassett v. Kia Motors America, Inc., 613 Pa. 371[, 455], 34 A.3d 1, 51 (Pa. 2011); Christianson v. Ely, [575 Pa. 647, 654-655], 838 A.2d 630, 634 (Pa. 2003).  Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.  Id.

As we discussed in R.J.T., there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not

equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. R.J.T., [608 Pa. at 28-30], 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. In re Adoption of Atencio, [539 Pa. 161, 165,] 650 A.2d 1064, 1066 (Pa. 1994).

In re Adoption of S.P., 47 A.3d 817, 826-827 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. In re R.N.J., 985 A.2d 273, 276 (Pa. Super. 2009). Moreover, we have explained, "The standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" Id. (quoting In re J.L.C., 837 A.2d 1247, 1251 (Pa. Super. 2003)).

This Court may affirm the trial court's termination of parental rights if any one subsection of Section 2511(a) has been satisfied. In re B.L.W., 843 A.2d 380, 384 (Pa. Super. 2004) (en banc). In our disposition, we focus on Section 2511(a)(2) and (b), which provide, in relevant part, as follows:

§ 2511. Grounds for involuntary termination

(a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

(b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

To satisfy the requirements of Section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: (1) repeated and continued incapacity, abuse, neglect, or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. In Re Adoption of M.E.P., 825 A.2d 1266, 1272 (Pa. Super. 2003). The grounds for termination of parental rights under

Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; rather, those grounds may include acts of refusal as well as incapacity to perform parental duties.  In the Interest of A.L.D., 797 A.2d 326, 337 (Pa. Super. 2002).  Nevertheless, parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities.  Id. at 340.  A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may be rejected as untimely or disingenuous.  Id.

> With regard to Section 2511(b), this Court has stated:
>
> Once the statutory requirement for involuntary termination of parental rights has been established under subsection (a), the court must consider whether the child's needs and welfare will be met by termination pursuant to subsection (b).  In re D.W., 856 A.2d 1231, 1234 (Pa. Super. 2004).  In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship.  In re C.S., [761 A.2d 1197, 1202 (Pa. Super. 2000)].

In re Z.P., 994 A.2d 1108, 1121 (Pa. Super. 2010).  This Court has explained that the focus in terminating parental rights under Section 2511(a) is on the parent, but under Section 2511(b), the focus is on the child.  In re Adoption of C.L.G., 956 A.2d 999, 1008 (Pa. Super. 2008) (en banc).  In reviewing the evidence in support of termination under Section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child."  23 Pa.C.S. § 2511(b).  The emotional needs and welfare

of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." In re K.M., 53 A.3d 781, 791 (Pa. Super. 2012). In In re E.M., [533 Pa. 115, 121, 620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. In re K.M., 53 A.3d at 791.

In re: T.S.M., 71 A.3d 251, 267 (Pa. 2013).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation." In re Z.P., 994 A.2d at 1121 (internal citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances . . . where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." In re K.Z.S., 946 A.2d 753, 762 (Pa. Super. 2008).

A parent's abuse and neglect are likewise a relevant part of this analysis:

concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a de facto beneficial bond exists. The psychological aspect of parenthood is more important in terms of the

- 10 -

development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

In re K.K.R.-S., 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted). Thus, the court may emphasize the safety needs of the child. See In re K.Z.S., 946 A.2d at 763 (affirming involuntary termination of parental rights, despite existence of some bond, where placement with mother would be contrary to child's best interests). "[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." In re B.,N.M., 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted).

In its May 10, 2019 opinion, the trial court stated as follows:

> Mother first argues in essence that this [c]ourt erred in finding grounds to terminate her parental rights. This [c]ourt cannot agree. The courts have made clear that grounds for termination include not only affirmative misconduct but also refusal and incapacity to perform parental duties. See, e.g., In re N.A.M., 33 A.3d 95, 100 (Pa. Super. 2011) (examining Subsection 2511(a)(2) and reasoning that parents "are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities."). As set forth in more detail above, Mother was given multiple opportunities to improve her conduct, but did not do so for more than a period of two years. Mother made some progress on her goals, but was living with her abuser right up to the time of the hearing, and her protestations that she would cut off contact with him were not credible or timely, even if true. Mother simply did not demonstrate that within a reasonable time she could stay sober and provide a safe environment for her daughter or that she had learned enough as a parent to avoid damaging and stressing [C]hild.

Mother, after two years, is not nearly in a position to assume parental responsibilities. As recently as this past Thanksgiving and Christmas, attempts by [Child] to enjoy time with Mother ended in fear, anxiety, guilt and an early return to her foster family. It is clear to this [c]ourt that [Child] is suffering damage from Mother's conduct and failure to progress further during these years and that [Child's] psychiatric problems are a result of the continued and failed efforts to have reasonable and healthy time with [Mother]. Accordingly, Mother's first argument is without merit. See, e.g., N.A.M. (affirming termination of a mother's rights under Subsection 2511(a)(2) where mother only showed modest compliance over three-year period of dependency of children in addressing, among other problems, her issues with poor parenting skills, anger management and mental health concerns and could not document other claimed participation).

Mother next contends that this [c]ourt erred in terminating her rights to [C]hild because termination would not serve [C]hild's needs and welfare and is detrimental to the valuable bond she shares with Mother. Under the law, bonding is assuredly one of many factors to consider in making a decision on termination of parental rights. E.g., Adoption of J.N.M., 177 A.3d 937, 943-44 (Pa. Super. 2018) (wherein the [c]ourt largely relied on the testimony of a visitation supervisor). The court must equally emphasize [C]hild's needs for safety and intangibles such as love, comfort, security and the stability [C]hild might have with the foster family. Id.

In J.N.M., two children were removed from their mother's care at the ages of 8 and 13 and spent nearly three years in care prior to the termination of [their] mother's rights. Id. at 939. In that case, the mother had several problems leading to the children's removal, including substance abuse and a history of living in a relationship involving domestic violence. Id. The mother there attempted various programs but did not manage to live independently or end her involvement with drugs and domestic violence, and there were times in which she did not see the children for weeks or months. Id. at 940. The mother argued that SPLC would be preferable to termination, based in part on the children's ambivalence about the adoption. Id. at 944. The trial court nonetheless terminated [the] mother's rights, and the appeals court affirmed. In so doing, the Superior Court noted that no formal bonding evaluation was required. Id. As here, the court was very troubled by the mother's behavior in inducing guilt

in the children in that [the] mother told them she would kill herself if she did not get them back. Id. at 945.

Similarly, Mother here has inflamed [Child's] sense of guilt and exaggerated responsibility for Mother's retention of parental rights by telling [Child] she was "f'ing everything up" and "ruining" things. This, too, necessarily creates a stressful and unhealthy role reversal between parent and child, and [Child] has refused to take a position on termination, fearing that seeking adoption would cause Mother to relapse or kill herself. See [J.N.M.,] at 945-46 (regarding testimony in J.N.M. that the mother-daughter relationship showed signs of co[-]dependent role reversal). As in J.N.M., this foster family testified they intended to keep [Child] in therapy, and this matter can be addressed in a therapeutic environment, and by all accounts, this foster family provides a very safe and positive space for [Child].

It must be noted that the psychologist testified that [Child] would undergo stress and guilt if Mother's rights were terminated, but the [trial court] cannot base its decision on this view for the reasons just stated. To this [c]ourt, the concerns regarding who feels what should run primarily from Mother to [C]hild, and not in the reverse; [Child] demonstrates too much responsibility and sense of power over Mother's feelings whereas Mother does not show appropriate concern for [Child]. See also, e.g., N.A.M., 33 A.3d at 101 (affirming termination of mother's parental rights, observing that the existence of a bond does not preclude terminating and recounting testimony indicating that the mother whose rights were terminated sometimes indicated to the children during pre-termination visits that they were to blame for being in care).

Not only does this [c]ourt find the bond in this case to be unhealthy, but based on the facts found by this [c]ourt and recited above, it is clear that [Child] has suffered a great deal from the addiction and choices Mother made. [Child] has a need for physical and emotional safety and the stability to thrive and needs parents who can provide stability. Indeed, [Child] has developed mental health problems, including depressive and anxiety disorders and has engaged in self-mutilation and suffered a recent psychiatric hospitalization. The psychologist believed that, if the

foster family moved,[4] [Child] would not have a viable chance at continuing her relationship with her [m]other, despite the foster mother's reassurances to the contrary. Tr., Vol. I, at 18-19, 61. The [c]ourt found Dr. Rosenblum to be inconsistent on this issue and could not accept his view; Dr. Rosenblum himself had to admit that a form of permanent legal custody in the foster family would not prevent the foster family from moving either, but would allow the [c]ourt to then review the matter of the move, id. at 61-62, but he also testified that [Child] needs to have the stress of these Court reviews lifted from her life. Id. at 60. This [c]ourt, after hearing the evidence, concluded that it would serve [C]hild's interest to give [C]hild the finality of adoption, including after weighing the psychologist's opinions in favor of SPLC.[2]

> [2] Importantly, the [c]ourt is not required to use expert testimony when evaluating a parental bond. See, e.g., In re D.L.B., 166 A.3d 322, 328 (Pa. Super. 2017).

> [Child] cannot continue in a state of parental and emotional limbo and termination of parental rights will serve her needs and welfare by getting her past this event so that she can make an adjustment before suffering a tragic occurrence or even more serious and permanent emotional damage. These conclusions are in concert with the findings of this [c]ourt made on the record at the close of the hearing. See, e.g., Tr., Vol. II, at 24-25, 27-44.

Trial Court Opinion, 5/10/19, at 10-13.

After careful review, we agree with the trial court's conclusions. Child was subjected to physical violence and exposed to domestic violence between Mother and R.H. when she was with Mother. However, Mother continues to cohabitate with her abuser, and Mother struggles with substance abuse.

_____

[4] Foster Mother testified that she and her family would like to relocate out of state, but they are waiting for the trial court to rule on the petition to terminate Mother's parental rights before making plans in this regard. N.T., 3/13/19, at 14-18. The trial court noted its awareness that if Mother's parental rights were terminated, Child wanted Foster Mother to adopt her. Id. at 30.

Additionally, Mother has failed to present documentation of completing treatment programs. Child has been removed from Mother's care for more than two years, and Mother has failed to remedy the conditions that led to Child's removal. We discern no abuse of discretion in the termination of Mother's parental rights pursuant to Subsection 2511(a)(2).

With respect to Subsection 2511(b), we note that our Supreme Court has stated that the mere existence of some bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition, and that "[e]ven the most abused of children will often harbor some positive emotion towards the abusive parent." T.S.M., 71 A.3d at 267 (2013) (quoting K.K.R.-S., 958 A.2d at 535). Our Supreme Court stated, "The continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding.") T.S.M., 71 A.3d at 267 (quoting In re Involuntary Termination of C.W.S.M., 839 A.2d 410, 418 (Pa. Super. 2003)). We conclude that there was sufficient, competent evidence of record regarding the harmful relationship between Child and Mother. Accordingly, involuntarily terminating Mother's parental rights will serve Child's developmental, physical, and emotional needs and welfare pursuant to Section 2511(b). Z.P., 994 A.2d at 1121.

For the reasons set forth above, we conclude that the trial court's decision to terminate Mother's parental rights under Subsections 2511(a)(2)

and (b) is supported by competent, clear, and convincing evidence. A "child's life 'simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.'" Z.P., 994 A.2d at 1125. Thus, we conclude that the trial court did not abuse its discretion in terminating the parental rights of Mother pursuant to Section 2511(a)(2) and (b). Accordingly, we affirm the trial court's order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/7/2019