J-S30017-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: | : | IN THE SUPERIOR COURT OF |
| C.C., A MINOR | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.C.C., MOTHER | : | No. 1343 EDA 2022 |

Appeal from the Order Entered April 27, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0002845-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: | : | IN THE SUPERIOR COURT OF |
| C.N.C.-W., A MINOR | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.C.C., MOTHER | : | No. 1344 EDA 2022 |

Appeal from the Decree Entered April 27, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000246-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: T.C., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: T.C.C., MOTHER | : | No. 1345 EDA 2022 |

Appeal from the Order Entered April 27, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0002846-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: | : | IN THE SUPERIOR COURT OF |
| T.N.C., A MINOR | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.C.C., MOTHER | : | No. 1346 EDA 2022 |

Appeal from the Decree Entered April 27, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000247-2018

J-S30017-22

BEFORE:   STABILE, J., McCAFFERY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY McCAFFERY, J.:                **FILED NOVEMBER 1, 2022**

This matter concerns the two children C.C., also known as C.N.C.-W., born in June 2014, and T.C., also known as T.N.C., born in April 2011 (collectively, Children). T.C.C. (Mother) appeals from: (1) the orders entered in the Philadelphia Court of Common Pleas, changing the permanency goals from reunification to adoption; as well as (2) the decrees involuntarily terminating her parental rights to the Children.[1] On appeal, Mother argues the trial court erred in: (1) admitting hearsay testimony; (2) finding sufficient evidence to support termination; and (3) failing to adequately address her claim of due process violations, caused by extensive delays in this case. After careful review, we affirm the termination decrees and dismiss as moot the appeals from the goal change orders.

## I.  Facts & Procedural History

We glean the underlying facts from the trial court's opinion and the certified record. In June of 2015, the Philadelphia Department of Human Services (DHS) received a child protective services (CPS) report that T.C.,

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] At the time of the termination proceedings, the identity of the Children's father(s) remained unknown. On April 27, 2022, the trial court also terminated the parental rights of any unknown putative father. We note Children's guardian *ad litem* (GAL) and child advocate have each filed a brief in support of affirmance.

- 2 -

then four years old, was taken to the hospital because he was bleeding from his nose. Mother admitted to striking him. Trial Ct. Op., 6/17/22, at 2. DHS also received reports that Mother had a history of substance abuse, was unemployed, and was diagnosed with bipolar disorder but was not being treated for it. *Id.*; N.T., 8/10/21, at 22.

In June of 2016, Community Umbrella Agency (CUA) implemented in-home services for the family. However, Mother did not comply with recommendations and refused to participate in a mental health evaluation and parenting classes. Trial Ct. Op. at 2. In October of 2016, DHS received another CPS report, which stated C.C., then two years old, was taken to the hospital for second and third degree burns on his hand. *Id.*

On two occasions between November and December 2016, Mother left Children in the care of relatives without their permission, for multiple days. Mother then signed a safety plan with DHS, which provided she would not leave Children with nonconsenting relatives. However, on December 20th, Mother again left Children with unwilling relatives, in contravention of the safety plan. Trial Ct. Op. at 3. On December 21st, DHS obtained an order of protective custody (OPC) for the Children. On December 23rd, at a shelter care hearing, the trial court lifted the OPC and ordered the temporary commitment to DHS to stand. The Children, who were five and two years old respectively, were placed together in a treatment foster home, where they have since remained. N.T., 8/10/21, at 49, 55.

At this juncture, we note that at some point, DHS filed allegations of child abuse against Mother. ***See*** N.T., 3/31/22, at 35.

On January 19, 2017, with Mother's agreement, the trial court adjudicated the Children dependent. Later, at the termination hearings, Mother testified she had agreed to adjudication in order "to get services started." N.T., 3/31/22, at 43, 56. However, Mother did not admit to any abuse or neglect. ***Id.*** at 43. Mother's single case plan (SCP) objectives were to: (1) ensure the Children's safety, well-being, and basic needs were met; (2) maintain court-ordered visitation; (3) comply with CUA services; (4) participate in mental health treatment and follow recommendations; (5) participate in Achieving Reunification Center (ARC) parenting, housing, and employment services; (6) cooperate with a Clinical Evaluation Unit (CEU) drug screen and dual diagnosis assessment and follow all recommendations; and (7) cooperate with random drug screening. Trial Ct. Op. at 3; N.T., 8/10/21, at 24-25. While these objectives remained the same throughout this case, Mother attended one out of "at least 19" single case plan meetings. ***See*** N.T., 8/10/21, at 24.

On March 27, 2018, DHS filed petitions to change the Children's permanency goals from reunification to adoption, as well as petitions to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). At this time, the Children had been in foster

placement for 15 months. Termination and review proceedings were continued several times.

Meanwhile, in June of 2019, DHS withdrew the allegations of child abuse against Mother. N.T., 3/31/22, at 35. No hearing on these allegations was ever held. *See id.* at 43; N.T., 4/27/22, at 15.

On July 31, 2019 — 16 months after the initial termination filing — DHS filed amended termination petitions, setting forth updated averments on Mother's progress with her SCP objectives. The case was continued several times again.

## II. Termination Hearings

The trial court conducted evidentiary hearings on August 10, 2021, and March 31, 2022, and heard oral argument on April 27, 2022. Mother was represented by counsel. The Children were represented by both a GAL and a child advocate. At the time of the last proceeding, T.C. was 11 years old and C.C. seven years old, and they had been in care for five years and four months.

At the hearing, Mother pointed out the July 2019 amended termination petition was "more than two-years old." N.T., 8/10/21, at 9. She raised the issue of the many delays in this matter and especially referred to a 15-month gap when no permanency review hearings were held, between September 2017 and January 2019. *Id.* at 75. Mother cited some of the reasons for the "double digit continuances:" the unavailability of a CUA supervisor, CUA worker, and child advocate; the illness of a prior trial judge; and the

reassignment of this case to another judge. N.T., 3/31/22, at 27, 28. Mother also alleged CUA continually "kicked [this case] to the back burner" and had a "long history of . . . not being available[ and] doing what it needed to do." *Id.* at 27, 28.

The trial court acknowledged the many continuances in this case but denied relief on Mother's claim that CUA failed to make reasonable efforts. N.T., 3/31/22, at 31. The court reasoned the court continuances were "simply . . . moving the case to another court date," and that it had not heard any evidence that CUA agency did not make reasonable efforts for reunification or otherwise perform its work. *Id.* at 31-32.

DHS called CUA case manager, Daniel Jackson to testify. As of the August 2021 hearing, he had begun working on this case one year earlier, and had reviewed the case file in its entirety. N.T., 8/10/21, at 20. Mother raised a general objection, arguing any testimony, about things Mr. Jackson did not have personal knowledge of, would be inadmissible hearsay. *Id.* at 21; N.T., 3/31/22, at 82. Mother contended DHS was attempting to present his testimony under the business records exception, but the case record was not presented and she could not cross-examine him on the contents thereof.[2]

---

[2] Pennsylvania Rule of Evidence 803(6) provides that a record, "kept in the course of a regularly conducted activity of a" business or institution, is not excluded by the rule against hearsay if, *inter alia*: (1) "the record was made at or near the time by — or from information transmitted by — someone with knowledge;" and (2) "making the record was a regular practice of that
*(Footnote Continued Next Page)*

N.T., 8/10/21, at 21. The trial court overruled the objection, but stated it would permit Mother to cross-examine Mr. Jackson about his "memory of what's in the file."[3] *Id.* at 22.

Mr. Jackson testified to the following: Mother completed an ARC parenting program in October 2018, but did not provide the certificate to CUA until May 2021. N.T., 8/10/21, at 25, 70, 83. Mother also completed an employee training program at ARC, in culinary arts, but this information was likewise not reported until May 2021. *Id.* at 83-84. Mother initially lived with her mother and did not complete a housing program, but Mr. Jackson completed an assessment of her subsequent home, a one-bedroom apartment, in May 2021 and concluded it was appropriate. *Id.* at 26-27. At the time, Mother was living with her three-year old daughter, Z. *Id.* at 27.

Mr. Jackson further testified Mother: did not complete a dual diagnosis assessment; last reported to the CEU in January 2018; and was not currently

---

activity[.]" Pa.R.E. 803(6)(A), (C). "The justification for this exception . . . is that business records have a high degree of accuracy because the nation's business demands it, . . . the records are customarily checked for correctness, and . . . record keepers are trained in habits of precision." ***Blumer v. Ford Motor Co.***, 20 A.3d 1222, 1236 (Pa. Super. 2011), *citing* McCormick, Evidence, § 306 at 720 (2d Ed. 1972).

[3] We further note Mr. Jackson testified that in December 2021, Mother called and threatened that "if she loses the case, [he] should watch [him]self." N.T., 3/31/22, at 15, 17. Mr. Jackson twice asked CUA to be removed from the case. *Id.* at 21. His requests were denied, and thus Mr. Jackson asked colleagues to assist with the case, by supervising visitation, calling Mother to arrange drug screenings, and making home assessment visits. *Id.* at 21-23.

enrolled in, and had never successfully completed, a drug and alcohol program. N.T., 8/10/21, at 28, 30. Mr. Jackson last talked to Mother about her drug use in May 2021, during the home assessment. *Id.* at 31. At that time, Mother: stated she was willing to do a drug test but she "would be . . . positive for marijuana;" but in fact she did not appear for any of the three drug screens, in August 2021, that Mr. Jackson had referred her to. *Id.* at 31-32. Mr. Jackson also testified Mother was not currently enrolled in any mental health program. *Id.* at 33. Mother was previously enrolled in a program with Men and Women for Human Excellence, but she was unsuccessfully discharged for lack of participation. *Id.* at 32.

Finally, Mr. Jackson testified Mother did not ask about the Children's medical appointments or parent/teacher meetings. N.T., 8/10/21, at 35-36. Mother "has not been consistent at all" with visitation and never progressed beyond unsupervised visitation with Children. *Id.* at 33; N.T., 3/31/22, at 84. Mr. Jackson observed four to six visits, and the visits generally "went pretty well." N.T., 3/31/22, at 83; N.T., 8/10/21, at 35. However, at one visit in December 2020, Mother "used profanity" and called C.C. "stupid." N.T., 8/10/21, at 35. Mr. Jackson addressed it with Mother, who responded that "it was taken out of context, that she was playing," and he was overreacting. *Id.* The Children were upset at the end of that visit. *Id.* The last visit Mother had was on Mother's Day of 2021, over the telephone. *Id.* at 33.

Mr. Jackson testified the Children look to their foster parent for daily basic and emotional needs, and they call her "Mom." N.T., 8/10/21, at 36. Mr. Jackson described Mother and the Children's relationship as follows: "[T]he [C]hildren look[ ] to her as just an adult, . . . like an uncle, or aunt, or a cousin[,]" but "not like a Mom figure." *Id.* Mr. Jackson opined it was in the Children's best interest to be adopted, and both he and the child advocate stated that Children have expressed they would like to be adopted by their foster parent. *Id.* at 14, 37, 39. According to Mr. Jackson, the foster mother was willing to have, and for the Children to have, a relationship with Mother after adoption. *Id.* at 66.

Mother, who was 27 years old at the time of the hearing, testified to the following: the first CUA case manager did not do anything, and Mother had a "horrible" experience with her. N.T., 3/31/22, at 44, 76. Subsequent case managers did not offer any help, despite her requests. *Id.* at 45. For example, CUA "put [her] in a housing program . . . that doesn't help with housing. They [were] helping with money management," but Mother already had a job. *Id.* Mother stated she smoked "more than one blunt" of marijuana "every two days," which was "[n]ot that often." *Id.* at 57-58. She acknowledged she did not appear for drug screens in December 2020, explaining she smoked marijuana, but she previously "gave multiple urines," and only stopped attending screenings when they were no longer requested. *Id.* at 52, 69.

Mother testified she was successfully discharged from mental health treatment and is currently treating with her therapist *via* walk-in visits. N.T., 3/31/22, at 53-54, 57. However, she did not have documentation of either. ***Id.*** at 57. Mother stated she has been seeing the same therapist since she was in first grade, but could only recall her first name, Liz. ***Id.*** at 72, 76. Mother acknowledged she never attended a CEU evaluation, and did not provide any reason why. ***See id.*** at 69.

Mother also testified that "[f]or a long time," the foster mother arranged informal visits with the Children. N.T., 3/31/22, at 38-39. However, the foster mother "plays pawns with" the Children, meaning that "if she doesn't like what [Mother does,] she'll stop [Mother] from seeing" the Children outside of the supervised visits. ***Id.*** at 38.

Mother further testified to the following regarding visitation. Initially, the visits were in the community and **not** supervised, but became supervised at the agency sometime in January or February 2022. N.T., 3/31/22, at 67. She has held several birthday parties for the Children. ***Id.*** at 40. Although Mother missed "a couple" visits with the Children, she "ma[d]e them up" with virtual visits. ***Id.*** at 46. Mr. Jackson did not supervise any in-person visits, and instead only virtual visits. ***Id.*** at 68. With regard to the December 2020 visit, Mother denied calling C.C. "stupid," and explained she merely laughed and "called him crazy because he was rolling on the floor." ***Id.*** at 69. Both the Children and the foster mother have requested snack foods and "small

things" for their gaming system, and she has provided them. *Id.* at 74. Two or three years earlier, Mother attended a doctor's appointment for the removal of C.C.'s tonsils, but both CUA and the foster mother have not permitted her to attend any other medical appointments or school meetings. *Id.* at 39-40, 43-44, 46. "Every time" Mother sees the Children, C.C. asks to go home with her. *Id.* at 47. Additionally, T.C. has stated to her, "I'm ready . . . to come home[,]" and has asked her "for advice about a girl." *Id.* at 49, 75. Finally, Mother acknowledged she would need a larger apartment if the Children were reunified with her, and she has a voucher for a two-bedroom apartment in her building. *Id.* at 51.

Following oral argument on April 27, 2022, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b) and changed the Children's permanency goals to adoption.

On May 27, 2022, Mother timely filed notices of appeal from the termination decrees and goal change orders, along with Pa.R.A.P. 1925(a)(2) concise statements of errors complained of on appeal. This Court *sua sponte* consolidated Mother's appeals.

### III. Statement of Questions Involved

Mother presents four issues for review:

1. Whether the trial court erred and/or abused its discretion when it involuntarily terminated Mother's parental rights, where such determination was not supported by clear and convincing evidence under the Adoption Act 23 Pa.C.S. § 2511(a)?

2.  Whether the trial court erred and/or abused its discretion when it involuntarily terminated Mother's parental rights without giving primary consideration to the effect that the termination would have on the developmental, physical and emotional needs of the Child[ren] under Section 2511(b) of the Adoption Act?

3.  Whether the trial court erred and/or abused its discretion by changing the [C]hildren's permanency goals to adoption when the DHS had not met its burden of proof that such changes would best serve the needs and welfare of each child[?]

4.  Whether the trial court, as a whole throughout the case, denied Mother her due process under both the Pennsylvania and United States Constitutions by [failing] to address her fundamental rights to the care and control of her child(ren) and to address the permanency plan for reunification in a timely manner[?]

Mother's Brief at 7-8 (suggested answers omitted).

## IV. Standard of Review & Section 2511 Authority

We note the standard of review in termination of parental rights cases:

[A]ppellate courts . . . accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re J.N.M.*, 177 A.3d 937, 941-42 (Pa. Super. 2018) (citation omitted).

Section 2511 of the Adoption Act governs involuntary termination of

parental rights and requires a bifurcated analysis. *See* 23 Pa.C.S. § 2511.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for

- 12 -

termination delineated in [subs]ection 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [subs]ection 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re J.N.M.*, 177 A.3d at 942 (citation omitted). In order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

The trial court terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). Here, we analyze the court's termination decrees pursuant to Section 2511(a)(8) and (b), which provide:

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

**(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the

- 13 -

basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(8), (b).

To satisfy Section 2511(a)(8), a petitioner:

must show (1) that the child has been removed from the care of the parent for at least twelve (12) months; (2) that the conditions which had led to the removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child. 23 Pa.C.S.A. § 2511(a)(8).

Termination under subsection 2511(a)(8) does not require an evaluation of a parent's willingness or ability to remedy the conditions that led to placement of his or her children.

*In re J.N.M.*, 177 A.3d at 943 (some citations omitted & paragraph break added). Furthermore, "the court shall not consider any efforts by the parent to remedy the conditions described [in the petition] which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S. § 2511(b).

We observe both Sections 2511(a)(8) and (b) require a court to assess the child's needs and welfare. However, the needs and welfare analyses required under each are distinct and must be addressed separately. *See In re C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*) (citation omitted). This Court has recognized "that the application of Section (a)(8) may seem harsh when the parent has begun to make progress toward resolving the

problems that had led to the removal of her children." ***In re Adoption of***

***R.J.S.***, 901 A.2d 502, 513 (Pa. Super. 2006).

> However, by allowing for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit [18] months, in which to complete the process of either reunification or adoption for a child who has been placed in foster care.

***Id.***

> This Court has stated:

> "[A] best interest of the child" analysis under both 2511(a)(8) and 2511(b) requires consideration of "[i]ntangibles such as love, comfort, security, and stability." To this end, this Court has indicated that the trial court "must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond. Moreover, in performing a "best interests" analysis:

>> The court should also consider the importance of continuity of relationships to the child, because severing close parental ties is usually extremely painful. The court must consider whether a natural parental bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. Most importantly, adequate consideration must be given to the needs and welfare of the child.

***In re I.J.***, 972 A.2d 5, 12 (Pa. Super. 2009) (citations omitted). "A parent's

basic . . . constitutional right to the custody and rearing of his or her child is

converted, upon the failure to fulfill his or her parental duties, to the child's

right to have proper parenting and fulfillment of his or her potential in a

permanent, healthy safe environment." *In re B.L.W.*, 843 A.2d at 388. "'Above all else . . . adequate consideration must be given to the needs and welfare of the child.' A parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (citations omitted).

## V. Termination Under Section 2511(a) & Hearsay Challenge

Mother's first articulated issue is whether DHS presented clear and convincing **competent** evidence to support termination under Sections 2511(a)(2), (5), and (8). Her central argument, however, is that the trial court erred in admitting hearsay testimony by CUA Case Manager Jackson. Mother's Brief at 19-24. Mother avers the court improperly permitted him "to testify at length about the history of the case prior to his being assigned[,] based entirely on his recollections of the contents of the case file[ ] and conversations with unidentified . . . CUA workers[.]" *Id.* at 19. Mother maintains this court error was not harmless because the "court's decision was based largely upon" this hearsay evidence, and "[t]he remaining admissible testimony . . . was insufficient" to support termination. *Id.*

On appeal, DHS and the GAL contend Mother's hearsay claim is waived for failure to include it in her Rule 1925(a)(2)(i) statement of errors complained of on appeal. DHS' Brief at 31-33; GAL's Brief at 40. We agree. Mother filed four Rule 1925(b) statements — one for each termination and goal change order for each child — raising a total of 26 issues. These

statements did not, however, include any claim regarding hearsay testimony. Furthermore, the statement of questions involved section, in Mother's brief, does not raise this issue. *See* Mother's Brief at 6-8. Accordingly, we agree with DHS and the GAL that it is waived. *See In re M.Z.T.M.W.*, 163 A.3d 462, 466 (Pa. Super. 2017) ("[I]t is well-settled that issues not included in an appellant's statement of questions involved and concise statement of errors complained of on appeal are waived.").

In any event, even if the issue were preserved, we would conclude no relief is due. Mother's argument presumes the contested evidence was presented to the trial court solely through Mr. Jackson's testimony. However, the same information, that Mr. Jackson testified to, was included in DHS' petitions to terminate and its exhibits, as well as prior filings, which were all a part of the certified record. DHS also admitted exhibits into evidence at the hearing, including four CEU reports and the Family Engagement Initiative (FEI) reports. N.T., 8/10/21, at 28-30, 55. Significantly, Mother did not object to the admission of these. Accordingly, any error in admitting hearsay testimony would be harmless and no relief would be due.[4]

Mother's remaining argument is that once we disregard the inadmissible hearsay, the only competent evidence presented was her "own testimony and

---

[4] We emphasize we offer no opinion on whether Mr. Jackson's testimony was inadmissible hearsay.

the limited knowledge of [Mr. Jackson, who is] untrained in social work [and] admitted that he didn't want to work with Mother[,] and whose agency refused to take him off the case." Mother's Brief at 24-25. In support of her claim that Section 2511(a) grounds were not established, Mother contends she: "clearly demonstrate[ed] her ability and . . . desire to parent her children[;]" "doted [on the Children] on their birthdays[;] got job training, works as a chef, got better housing[,]" and "developed a strong cooperative relationship with the foster parent[.]" *Id.* at 25. Finally, Mother avers "she waited . . . nearly five years for her evidentiary day in court, despite the exceptional lack of attention by the system[.]" *Id.* We conclude no relief is due.

As stated above, we focus our review of the trial court's Section 2511(a) determinations on Subsection (a)(8). It was not disputed that Children have been in the continuous care of DHS since December 2016; thus, the 12-month period in Section 2511(a)(8) has been satisfied. *See* 23 Pa.C.S. § 2511(a)(8). The court was thus required to determine whether "the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child." *See id.* The court, however, was not required to evaluate Mother's "willingness or ability to remedy the conditions that led to placement of" the Children. *See In re J.N.M.*, 177 A.3d at 943.

To the extent Mr. Jackson's and Mother's testimony conflicted, we defer to the trial court's credibility determinations and findings of fact, so long as

they are supported by the record.  ***See In re J.N.M.***, 177 A.3d at 941-42.

The court found:

> The conditions that led to the Children's removal were concerns regarding lack of proper supervision[,] Mother's substance abuse and mental health history.  . . .  Since the Children have been in placement, **Mother has made minimal progress to alleviate the circumstances** that brought the Children into care despite attempts by CUA to facilitate reunification.  **Mother's compliance with her SCP objectives was moderate at most.** The Children have been in care for over five years, which is much longer than the statutory period requires.
>
> Mother failed to successfully complete a dual diagnosis assessment or treatment program to address her mental health and substance abuse.  The evidence reflects that the last time Mother reported to the CEU was on January 15, 2018[, more than four years earlier.]  The CEU progress reports . . . show that Mother tested positive on numerous occasions throughout the case.  Although Mother engaged in a dual diagnosis program in 2017, she was unsuccessfully discharged due to lack of participation.  Mother is actively engaged in marijuana use and does not have a medical marijuana card.
>
> Mother complied with two of her SCP objectives **after** the petitions to terminate her parental rights were filed.
>
> The testimony reflects that Mother's visits with the Children never progressed to unsupervised.  Mother also failed to consistently visit with the Children throughout the case, which negatively impacted her relationship with them.  There are also concerns regarding the quality of Mother's visits, including an incident in which CUA had to redirect Mother after she used profanity toward the Children and called C.C. stupid[.]  This behavior upset the Children.
>
> The evidence reflects that while there has been some compliance with her SCP objectives, there has not been enough progress made to enable reunification of the Children with Mother. Mother has failed to complete her single case plan objectives to alleviate the needs for placement.  . . .

> The Children deserve permanency and should not wait indefinitely. Moreover, the evidence clearly established that termination would best serve the needs and welfare of the Children. . . .

*Id.* at 18-19 (emphases & paragraph breaks added).

After careful review, we conclude the record supports the trial court's findings. Mother acknowledged she was aware of her SCP objectives. N.T., 3/31/22, at 65. She confirmed she never attended CEU for an evaluation, and that she smokes at least one blunt every two days. *Id.* at 57-58, 69-70. While Mr. Jackson testified Mother was unsuccessfully discharged from mental health treatment with Men and Women for Human Excellence, Mother could not provide documentation in support of her contrary contention that she successfully completed the program. *See* N.T., 3/31/22, at 57; N.T., 8/10/21, at 32. In light of this record, we conclude the trial court did not abuse its discretion in finding the conditions that led to the removal or placement of Children still exist. *See* 23 Pa.C.S. § 2511(a)(8); *In re I.J.*, 972 A.2d at 11.

Finally, the trial court's finding, that termination would best serve the Children's needs and welfare, is likewise supported by the record. *See* 23 Pa.C.S. § 2511(a)(8); *In re I.J.*, 972 A.2d at 11. Mr. Jackson testified Children call the foster parent "Mom" and look to her for their daily basic needs and emotional needs. N.T., 8/10/21, at 36. The foster parent is a pre-adoptive placement, and Children have lived with her for more than five years. *Id.* at 36-37. Furthermore, Mr. Jackson opined Children view Mother as an aunt or cousin, but "not like a [m]om figure." *Id.* Both Mr. Jackson and the

child advocate stated that Children have expressed to them that they want to live with, and be adopted by, their foster parent. *Id.* at 14, 37. Finally, Mr. Jackson believed it was in Children's best interest to be adopted because their foster parent provided them with love, care, and the stability they deserve. *Id.* at 39. Based on the foregoing testimony, we conclude the record supports the trial court's decision to terminate Mother's parental rights under Section 2511(a)(8). *See In re J.N.M.*, 177 A.3d at 941-42.

## VI. Termination Under Section 2511(b)

Mother's entire discussion for her second issue spans two sentences. First, she argues the trial court abused its discretion in addressing Section 2511(b) because DHS failed to prove grounds for termination under Section 2511(a). Mother's Brief at 26. *See In re J.N.M.*, 177 A.3d at 942 (court can only consider Section 2511(b) after it finds grounds for termination under 2511(a)). In the alternative, Mother asserts the court abused its discretion under Section 2511(b) because much of the case "was outside [her] control, given the extraordinarily inefficient administration of justice that occurred here." Mother's Brief at 26.

As we have determined the trial court did not abuse its discretion in finding sufficient grounds for termination under Section 2511(a)(8), we determine no relief is due on her first claim. *See* Mother's Brief at 26. We conclude Mother's second claim is waived for failure to present meaningful discussion. *See In re M.Z.T.M.W.*, 163 A.3d at 465-466 ("[T]his Court will

not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority.").

Even if Mother did not waive this issue, we would conclude no relief is due. The trial court specifically found:

> There was compelling testimony . . . that while the children have a relationship with Mother and view her as a visitation resource, they do not share a parent-child relationship with [her. Mr. Jackson] credibly testified that Mother's relationship with the Children was more akin to an adult relationship, such as an uncle, aunt, or cousin, rather than a mother figure.

Trial Ct. Op. at 23. The court also considered that visitation has never been unsupervised throughout the case, and Mother was "inconsistent with visitation, which has negatively impacted her relationship and bond with the Children." *Id.* The court found the Children do not look to Mother for love, comfort, security, and stability, but instead the foster parent, whom the Children call "Mom." *Id.* at 23-24. The court found the Children would not suffer irreparable harm if Mother's parental rights were terminated. *Id.* at 23. On appeal, Mother does not address any of the trial court's discussion, but rather cites the many delays in this case. *See* Mother's Brief at 26. We conclude no relief is due.

## VII. Goal Changes

In Mother's third issue, she asserts the trial court abused its discretion in changing the Children's permanency goals without adequately considering "the external circumstances of this case[,]" namely "[t]he tragically long length of time [the Children] remained in care[,]" caused by "the

extraordinary 'perfect storm' pandemic, overburdened judicial system and multiple changes in . . . judges, experts, solicitors, GALS, and CUA case managers."  Mother's Brief at 27.

Given our affirmance of the termination decrees, Mother's challenge to the goal change orders is moot.  ***See In the Interest of D.R.-W.***, 227 A.3d 905, 917 (Pa. Super. 2020) (challenge to goal change order is moot when this Court affirms a termination decree).  We nevertheless address her claims, concerning the delays in this case, in the next section.

### VIII.  Due Process Violations

In Mother's final issue, she asserts the delays throughout this matter deprived her of her fundamental rights to due process.  Mother's Brief at 27. Mother emphasizes there were extended delays between permanency review hearings, and she was unable to litigate a claim of CUA's lack of reasonable efforts until the combined termination/goal change hearing.[5]  ***Id.*** at 28-30.

As stated above, we conclude any challenge to the **goal change** orders to be moot.  To the extent Mother avers the **termination** decrees were improperly entered, we agree with DHS and the GAL that Mother has not cited any legal authority to support her claim that court delays violated her due

---

[5] The child advocate's brief supports affirmance of the termination decrees and goal change orders.  Nevertheless, the child advocate contends Mother's contention that her substantive due process were violated when the trial court did not inquire into whether CUA and DHS made reasonable efforts.  Child Advocate's Brief at 15-21.

process rights. *See* DHS Brief at 35-36; GAL Brief at 56-57. *See also In re M.Z.T.M.W.*, 163 A.3d at 465 ("[T]his Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority.").

In any event, we agree with the trial court's determination that no relief is due. "Due process requires nothing more than adequate notice, an opportunity to be heard, and the chance to defend oneself in an impartial tribunal having jurisdiction over the matter." *In re J.N.F.*, 887 A.2d 775, 781 (Pa. Super. 2005). "Due process is flexible and calls for such procedural protections as the situation demands." *In re Adoption of Dale A.*, 683 A.2d 297, 300 (Pa. Super. 1996) (citation omitted).

Here, the trial court reasoned:

> Mother was appointed counsel who represented her at each hearing. At each hearing, including the [termination] hearings, Mother had the opportunity to participate, testify, as well as present evidence and witnesses on her own behalf. . . . Mother's [c]ounsel cross-examined witnesses and presented evidence.

Trial Ct. Op. at 25. The trial court also pointed out, at both the termination hearing and in its opinion, that despite some notations in the docket that the matter was "continued," hearings were in fact held on those days:

> While [the trial docket] indicates that Continuance Orders were docketed on April 11[ and] November 20, 2018; January 4[ and] October 24, 2019; June 29, 2020; February 19[ and] May 12, 2021, a review of each Domestic Relations Order (DRO) . . . shows that Permanency Review Orders were docketed for those hearing dates and Court Orders were issued [regarding] Mother's compliance.

*Id.* at 26; *see also* N.T., 4/27/22, at 20 ("It should be noted that, notwithstanding [the docket] stating, 'continuance order,' that does not mean that the matter was continued. . . . In fact, most of those dates, a hearing was held[.]").

The trial court acknowledged the COVID-19 pandemic also "led to a brief Court closure, which suspended court proceedings." Trial Ct. Op. at 26. Nevertheless, the court concluded: "Despite continuances, there was no evidence presented that the case work ceased or was lacking to facilitate reunification. Thus, although this case was continued many times, Mother's due process rights were not violated." *Id.*

Our review of the record supports the trial court's findings. Although there were numerous delays, the trial court continued to supervise the case, review Mother's progress, and monitor DHS' efforts. Mother received adequate notice, had an opportunity to be heard and to respond to DHS' petitions in an impartial tribunal. Finally, Mother does not explain how the court delays affected her ability to meaningfully complete the various, mandated mental health and drug evaluations and treatment, drug screenings, and visitations. Accordingly, no relief is due.

## IX. Conclusion

Based on the foregoing, we affirm the decrees terminating Mother's parental rights. We dismiss as moot the appeals from the order changing Children's permanency goals to adoption.

Termination decrees at 1344 EDA 2022 and 1346 EDA 2022 affirmed. Appeals from goal change orders at 1343 EDA 2022 and 1345 EDA 2022 dismissed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>11/1/2022</u>