J-S16031-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3133 EDA 2022 |

Appeal from the Order Entered November 9, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0001315-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: K.J.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3134 EDA 2022 |

Appeal from the Decree Entered November 9, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000654-2021

BEFORE:  DUBOW, J., MURRAY, J., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.:                    **FILED MAY 31, 2023**

In these consolidated appeals,[1] S.S. (Mother) appeals from the decree

entered in the Philadelphia County Court of Common Pleas involuntarily

---

[1] On January 4, 2023, this Court entered an order consolidating these appeals
*sua sponte*.  Order, 1/4/23.

terminating her parental right to K.J.S. (Child),[2] born in September of 2012, and the order, entered that same day, which changed Child's permanency goal from reunification to adoption.[3] Upon our review, we affirm the termination decree and dismiss as moot the appeal from the goal change order.

Child was born to Mother in September of 2012. Father is not listed on Child's birth certificate, and his whereabouts are unknown. *See* Petition for Involuntary Termination of Parental Rights, 11/2/21, Exhibit B, Child's Certification of Birth; Trial Ct. Op., 1/27/23, at 1.

On December 9, 2020, the Philadelphia Department of Human Services (DHS) applied for emergency protective custody of Child, after Mother was arrested for theft and trespassing; the trial court granted an order of protective custody that same day. *See* DHS's Application for Order of Protective Custody, 12/9/20, at 2 (unpaginated); Order, 12/9/20. Following a shelter care hearing on December 11th, the court adopted the recommendation of DHS that Child should remain in foster care placement. Order, 12/11/20. Child was subsequently adjudicated dependent on February 23, 2021. Order of Adjudication & Disposition, 2/23/21. Although Mother was

---

[2] K.J.S. and K.S. are the same child.

[3] That same day, the trial court also terminated the parental rights of J.M. (presumptive Father), as well as any unknown putative father. *See* N.T., 11/9/22, at 65-66. Neither presumptive Father, nor any other putative father, participated in these proceedings, or appealed from the termination order.

released from prison in February of 2021, she was later incarcerated in August of 2021, following her arrest for murder. *See* N.T. at 13, 16.

On November 2, 2021, DHS filed a petition for goal change to adoption, and a petition seeking the involuntary termination of the parental rights of both Mother and presumptive Father. *See* DHS's Petition for Goal Change to Adoption, 11/2/21, 1-2; DHS's Petition for Involuntary Termination of Parental Rights, 11/2/21, at 3-6. The scheduled hearing was continued several times due to the unavailability of the parties. The goal change/termination hearing was finally conducted on November 9, 2022, at which time the following testimony was presented.[4]

Community Umbrella Agency (CUA) Case Manager Supervisor Shiera Williams, who has been Mother's case manager since Child's initial placement, detailed DHS's involvement with Mother and Child. She testified that DHS received a General Protective Services (GPS) report in January of 2020 that Mother's home did not have "any gas, any electric, [or] running water for almost five to six months[,]" there was no food in the home, and Child "was sleeping in the car." N.T. at 10. The report also indicated that Mother was using drugs, and Child "[p]resented late to school and unkept." *Id.* Case Manager Williams did not elaborate as to what services were provided to Mother at that time. However, on December 9, 2020, DHS applied for, and

---

[4] Child's interests were represented by Child Advocate Aaron Mixon, Esquire, and Guardian Ad Litem (GAL) James DeMarco, Esquire.

was granted, an emergency order for protective custody of Child when Mother was arrested for theft and trespassing. *See id.* at 10-11; DHS's Application for Order of Protective Custody at 2 (unpaginated). Child was placed in the pre-adoptive foster home where he currently resides. *See* N.T. at 19. Although he was removed for a few months to kinship care, he returned to the pre-adoptive foster home in April of 2021.[5] *See id.*

Mother was released from prison in February of 2021. *See* N.T. at 13. On February 23, 2021, Child was adjudicated dependent and committed to DHS. *Id.* at 11. Case Manager Williams stated that she prepared "single case plans" for Mother, which she updated regularly. *Id.* at 13-14. She testified Mother's objectives, which have remained the same throughout Child's placement, were as follows:

> . . . to comply with CUA case management services, to comply with all court orders, which is a [Behavioral Health Services (BHS)] Eval[uation], CUA dual assessment and random[ drug screenings], . . . [a referral to Achieving Reunification Center (ARC)] for parenting, housing, and employment, supervised visits at [C]hild's discretion once a week in person at that time, and to obtain and maintain employment and to provide a lease for housing.

*Id.* at 14. Case Manager Williams testified that the only objective with which Mother was compliant was visitation. *Id.* Although she was provided with a copy of her objectives and received the pertinent referrals, Mother failed to

---

[5] Child's kinship care was with a maternal cousin. *See* N.T. at 26.

schedule any evaluations or avail herself of any services. *Id.* at 15, 30. She also did not provide adequate proof of housing or employment.[6] *Id.* at 15.

Case Manager Williams explained that Mother was generally consistent with supervised visitations, and the visits she personally supervised were "good." N.T. at 15-16, 27, 39. However, both his foster parents and kinship caregivers noticed that Child would "act out behaviorally when he returned . . . home" after his visits. *Id.* at 26. Child indicated that Mother "told him to do stuff[,]" such as "drag[ging]" the kinship caregiver's daughter, although Mother denied that allegation. *Id.*

In May of 2021, Mother was "removed from the visitation list" because she missed three consecutive visits. N.T. at 27, 35. Also around that time, Mother's in-person visits were suspended due to an "altercation where [M]other tried to remove [C]hild" from the agency, and the police were called. *Id.* at 35. Mother was late to that visit and was "really upset" because it was going to be cancelled. *Id.* After that incident, Mother's visits were virtual. *Id.* Case Manager Williams stated that Mother missed a "few" of the virtual visits because she tried to log on late (past the 15-minute grace period) or she failed to confirm the visit 48 hours in advance. *Id.* at 36.

---

[6] Under cross-examination, Case Manager Williams acknowledged that although Mother was employed, she failed to provide the requested documentation of her employment. N.T. at 33. The case manager also conceded that Mother was "staying in" her paramour's house, but explained that it was not appropriate for Child. *Id.* at 33-34 (explaining there were "derogatory sayings" written "all over the walls[,]" the ceiling was falling down in the bathroom, the basement was inaccessible, the sleeping arrangements were "improper," and "there was no heat in the home").

In August of 2021, Mother was arrested for murder, and has remained incarcerated since that time. N.T. at 16. Following her arrest, the court determined visitation would be at the discretion of Child's therapist, and the therapist did not "make a recommendation" for visitation. *See id.* at 27-28. Case Manager Williams also confirmed that Child did not want to visit Mother after her incarceration. *See id.* at 40. Subsequently, on June 23, 2022, Mother entered an open guilty plea to charges of third-degree murder and possessing an instrument of crime. *See id.* at 17, Exhibit DHS-5 (Mother's criminal docket). In September of 2022, she was sentenced to serve an aggregate term of 7½ to 17 years' imprisonment. *Id.*

Case Manager Williams confirmed that Child's foster parents provide Child with "love, stability, safety, and support" and meet all of his "emotional, medical, educational, developmental and daily needs[.]" N.T. at 20. She also testified that his foster mother "share[s] his primary parent child bond[.]" *Id.* With regard to Mother, Case Manager Williams described her relationship with Child as "[s]trained." *Id.* at 21. She stated: "I don't think that he looks to her for any care or safety. When I speak to him he doesn't really want to talk about [Mother]." *Id.* Case Manager Williams reported that Child told her that although he would like to visit with his extended family, "he does not want to reside with them" and "he would like to be adopted." *Id.* at 22. Child Advocate Attorney Mixon confirmed that he spoke with Child in August of 2021, and Child confirmed that he "did understand adoption" — which Child

described as "[l]iving with [his foster family] forever" — and he wanted to be adopted by his foster parents. *Id.* at 57-58 (quotation marks omitted).

Case Manager Williams opined that a goal change to adoption and termination of Mother's parental rights was in Child's best interest to "establish permanency" and "a sense of belonging." N.T. at 23-24. She also opined that termination would not result in "irreparable harm" to Child, and that Child did not have a bond with Mother "at this point[.]" *Id.* at 20-21, 23.

Mother testified at the termination hearing and explained that she participated in an anger management program during her first stint in jail (December 2020 until February 2021) but was unable to complete it before she was released. N.T. at 42-43. She described her visits with Child as "lovable" and "emotional." *Id.* at 44. Mother stated that "for him to be snatched away from [her] was very traumatic for him as well as it was for [her]." *Id.* She claimed she was late for visitation appointments because she worked in New Jersey and had explained that to Case Manager Williams. *Id.* at 44-45. Mother also stated that she provided proof of employment *via* text, *i.e.*, screenshots of her paystubs. *Id.* at 45-46. She further claimed that she cleaned up her house so that it would be appropriate for Child to return, and that Case Manager Williams told her she "did a remarkable job[.]" *Id.* at 47.

With regard to the altercation during the May 2021 visit, Mother acknowledged that she arrived 10 minutes late because she was coming from work. N.T. at 49. Although Case Manager Williams permitted her to meet

with Child in the lobby, Mother claimed that Child's foster father "didn't like the fact that he still had to wait on [her.]" *Id.* at 49-50. She stated that she was the one who called police for help, and she was not "trying to take [her] son." *Id.* at 50.

Mother further testified that Child "never expressed to [her] that he wanted to be adopted" or that he "didn't want to live with [her] anymore." N.T. at 52. She acknowledged that her prison release date is February 13, 2029, but that she hoped she could complete programs to receive an "early release." *Id.*

At the conclusion of the hearing, the trial court stated that it found Case Manager Williams' testimony "credible" and that Mother failed to comply with "any of her single case plan objectives outside of visits with [C]hild while she was out of custody until August of 2021" or while in prison from August 2021 until the date of the hearing. N.T. at 64-65. Thus, the court determined DHS met its burden of proving by clear and convincing evidence that termination was in Child's best interest pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8), and (b). *Id.* at 65-66. That same day, the trial court entered a permanency review order changing Child's goal from reunification to adoption, and a decree involuntarily terminating Mother's parental rights to Child. These timely appeals follow.[7]

_____

[7] Mother filed a separate notice of appeal from each order, accompanied by identical concise statements of errors complained of on appeal pursuant to
*(Footnote Continued Next Page)*

Mother raises the following three issues for our review:

1. Did the [trial] court . . . err in finding that [DHS] had met its burden in proving grounds for termination of parental rights under 23 Pa.C.S.[ ]§ 2511(a)(1), (2), (5), and (8)?

2. Did the [trial] court . . . err in finding that DHS had met its burden to prove that termination would be in [C]hild's best interests, under § 2511(b)[?]

3. Did the [trial] court . . . err when it found that DHS by clear and convincing evidence had met its burden to change [C]hild's goal to adoption?

Mother's Brief at 5.[8]

Mother's first two issues challenge the trial court's decree involuntarily terminating her parental rights to Child. Our review of a termination decree is well-settled:

> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. This standard of review corresponds to the standard

_____

Pa.R.A.P. 1925(a)(2)(i) (in a family fast track appeal, concise statement "shall be filed and served with the notice of appeal").

We note that Mother's concise statement does not present any challenge to the goal change order. *See* Mother's Concise Statement of Matters Complained of on Appeal, 12/9/22, at 1-2 (unpaginated). Moreover, she presents two claims in the concise statement that she does not address in her brief — (1) Mother was not properly served with notice of the termination hearing, and (2) Mother's due process rights were violated. *See id.* Thus, we conclude she has abandoned these issues on appeal.

[8] DHS filed an appellee brief opposing Mother's claims. Child's GAL Attorney DeMarco, did not submit a responsive brief, but rather filed a letter indicating that he joined the brief filed by DHS. *See* Letter, 3/31/23. Child Advocate Attorney Mixon did not respond to Mother's appeal, although he advocated for the termination of her parental rights at the hearing. *See* N.T., at 64.

employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but it does not require the appellate court to accept the lower court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the trial court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. Thus, absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. However, [w]e must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re Adoption of C.M.*, 255 A.3d 343, 358–59 (Pa. 2021) (citations & quotation marks omitted).

Section 2511 of the Adoption Act governs the involuntary termination of parental rights and requires the trial court to conduct a bifurcated analysis. *See* 23 Pa.C.S. § 2511.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [Subs]ection 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [Subs]ection 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re Adoption of J.N.M.*, 177 A.3d 937, 942 (Pa. Super. 2018) (citation omitted). In recognition of the "the significant gravity" of the termination of

parental rights, as well as its "far-reaching and intentionally irreversible consequences[,] . . . the burden of proof is upon the party seeking termination to establish by clear and convincing evidence the existence of the statutory grounds for doing so." *In re Adoption of C.M.*, 255 A.3d at 358 (citation & quotation marks omitted).

> [C]lear and convincing evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Id.* (citation & quotation marks omitted).

In the present case, the trial court terminated Mother's parental rights pursuant to Subsections 2511(a)(1), (2), (5), (8), and (b). *See* Decree of Involuntary Termination of Parental Rights, 11/9/22, at 1-2; Trial Ct. Op. at 7. However, in order to affirm the termination of parental rights, we need only agree with the trial court's decision as to any one subsection of Section 2511(a), as well as subsection (b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Accordingly, we confine our analysis to Subsection 2511(a)(2) and (b).

Subsection 2511(a)(2) provides for the termination of parental rights upon proof of the following:

> The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2). If the court determines termination is warranted under subsection (a), it must then consider the needs and welfare of the child under subsection (b):

> The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

Relevant herein, we note that the Pennsylvania Supreme Court has held that a parent's incarceration,

> while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to [Subsection] 2511(a)(2).

*In re Adoption of S.P.*, 47 A.3d 817, 830 (Pa. 2012) (citations omitted). Nevertheless, a parent's incarceration itself is not determinative. Rather, as noted above, a trial court must also consider the child's needs and welfare under Subsection 2511(b). Thus, the Supreme Court has explained that "trial courts must carefully review the individual circumstances for every child to

- 12 -

determine, *inter alia*, how a parent's incarceration will factor into an assessment of the child's best interest." *Id.* at 830-31.

Turning to Mother's first issue on appeal, she contends that DHS failed to establish, by clear and convincing evidence, grounds for the involuntarily termination of her parental rights under Subsection 2511(a). *See* Mother's Brief at 12. Although she addresses each of the statutory subsections, we will focus on her argument concerning Subsection (a)(2). First, Mother emphasizes that under Subsection 2511(a)(2), at trial court **is permitted** to consider any efforts she made after the termination petition was filed "to remedy the conditions described therein[.]" *Id.* at 14. Her entire argument regarding subsection (a)(2) is as follows:

> In many instances, Mother did **initiate** such efforts. Mother did make progress with her objectives. And if the law permits the court to consider efforts, even when **initiated** after notice that the [termination p]etition has been filed, then *a fortiori*, there is no requirement that the efforts be **completed** at some arbitrary date.
>
> DHS failed to prove by "clear and convincing" evidence that grounds exist to terminate parental rights, under § 2511(a)(2).

*Id.* at 14. Mother does not state what "efforts" she "initiated" to meet her objectives either before or after the termination petition was filed, nor does she provide any citations to the hearing testimony. *See id.*

Upon our review, we conclude the trial court did not abuse its discretion in finding grounds for termination under Subsection 2511(a)(2). First, it is evident that the "repeated and continued incapacity, abuse, neglect or refusal of [Mother] caused [C]hild to be without essential care, control or subsistence

- 13 -

necessary for his physical or mental well-being[.]"  *See* 23 Pa.C.S. § 2511(a)(2).  Indeed, Mother does not even argue to the contrary.

Child was initially removed from Mother's care in December of 2020, when Mother was arrested and imprisoned for theft.  *See* DHS's Application for Order of Protective Custody at 2 (unpaginated).  At the time, Mother's home did not have any food, electricity or running water, and Child was sleeping in the car.  *See* N.T. at 10.  Although Mother was released from custody in February of 2021, she failed to comply with any of her case plan objectives, other than visitation with Child.  *See id.* at 13-15.  Her in-person visits ceased, however, in May of 2021, after she tried to leave with Child.  *Id.* at 35.  In August of 2021, Mother was, once again, arrested and incarcerated on a charge of murder.  *Id.* at 16.  Thus, Mother's incarceration, as well as her refusal to comply with her service plan objectives, has left Child without essential care.  *See* 23 Pa.C.S. § 2511(a)(2).

To the extent Mother argues that the cause of her incapacity or neglect can be remedied within a reasonable period of time, we disagree.  First, Mother failed to make any progress toward her reunification goals before her August 2021 arrest.  In fact, the trial court commented that Mother "took no accountability for her actions and blamed others for" her missed visits and the May 2021 altercation that led to cessation of in-person visits.  *See* Trial Ct. Op. at 13.  Presently, Mother is serving a minimum term of 7½ to 17 years' imprisonment, with a minimum release date of February 13, 2029.  *See* N.T. at 16-17, 52, Exhibit DHS-5 (Mother's criminal docket).  At that time, Child

will be nearly 17 years old. While Mother maintains that "there is no requirement that [her] efforts [towards meeting her reunification objective] be completed at some arbitrary date[,]"[9] we emphasize that "[p]arental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs." *See Interest of K.M.W.*, 238 A.3d 465, 474 (Pa. Super. 2020) (*en banc*) (citation & quotation marks omitted). Indeed, it is axiomatic that a parent must make "diligent efforts" and "utilize all resources" to preserve and maintain her relationship with her child. *See id.* (citations omitted). Accordingly, we conclude the record supports the trial court's determination that DHS presented clear and convincing evidence to support termination of Mother's parental rights under Subsection 2511(a)(2).[10]

In her second issue, Mother contends DHS failed to provide clear and convincing evidence that termination was warranted under Subsection 2511(b). *See* Mother's Brief at 16. She insists "there was insufficient evidence that the bond between [C]hild and . . . Mother has been broken[,]" and "inadequate testimony concerning the likely effect . . . severing any bond"

_____

[9] Mother's Brief at 14 (emphasis omitted).

[10] Because we conclude termination was warranted under Subsection 2511(a)(2), we need not consider Mother's arguments regarding the lack of evidence supporting termination under Subsections (a)(1), (5), and (8). *See In re B.L.W.*, 843 A.2d at 384.

would have on Child. *Id.* at 17. Mother maintains the facts of her case are similar to *In re T.F.*, 847 A.2d 738 (Pa. Super. 2004).

The trial court provided the following analysis with regard to termination under Subsection 2511(b):

> In regard to 2511(b) and the best interest of [Child, Case Manager] Williams testified that [Child] is currently placed in a preadoptive home though New Foundations since April 2, 2021. She testified that [Child] has established close personal relationships with his current caregivers which is the resource parent, her husband, and their daughter. [Case Manager] Williams further testified that the [foster] mother and father provide [Child] with love, stability, safety, and support and that they meet all of his emotional, medical, educational, developmental, and daily needs. [Case Manager] Williams testified that at this point [Child] shares his primary parent child bond with the current caregivers. There is no parent child bond between [Child] and his Mother according to [Case Manager] Williams and she described the relationship as "strained" as [Child] does not look to Mother for any care or safety. [Case Manager] Williams further testified that Mother does not meet any of [Child's] emotional, medical, educational, developmental, or daily needs and has not done so at all during the life of this case. [Case Manager] Williams has no concerns in regard to the current caregiver. [Child] told [her] that he wishes to remain in his current setting and would like to be adopted. [Child] wants to visit with his family but does not want to reside with them. The Child Advocate, Aaron Mixon, Esq., also testified at trial that [Child] indicated to him when he last met with [Child] on August 12, 2022, that [Child] wishes to remain with his current caregivers forever because [Child] understands that to be adoption.
>
> The most recent time that [Case Manager] Williams saw [Child] was November 8, 2022. He was safe and his basic needs were being met. [Case Manager] Williams testified that she believed that it was in the best interest of [Child] to terminate the rights of Mother and any father of [Child] so that permanency and a sense of belonging could be established for him. [She] did not believe that the termination of parental rights of Mother or unknown father would cause any irreparable harm to [Child].

[Further, Case Manager] Williams believed that it is in the best interest of [Child] to change his goal to adoption.

The Court found credible the testimony from [Case Manager] Williams regarding the close bond between [Child] with the current caregivers, that they are meeting all of his needs and that there is no bond between Mother and [Child]. The Court also found credible the testimony from [Case Manager] Williams and [Child Advocate] Mixon that [Child] wishes to remain in his current placement and to be adopted by the current caregivers. Consequently, the termination of Mother's parental rights would be in the best interest of [C]hild pursuant to 23 Pa.C.S.[ ] § 2511(b). Additionally, termination of parental rights would not have a detrimental effect on the developmental, physical and emotional needs of [Child].

Trial Ct. Op. at 15-16 (record citations omitted).

Upon our review, we agree with the determination of the trial court that DHS presented sufficient clear and convincing evidence to support termination of Mother's parental rights under Subsection 2511(b). Contrary to Mother's assertion, Case Manager Williams — who has been involved in the matter since Child's initial placement — testified that Child no longer has a bond with Mother, and that termination of her parental rights would not be detrimental to him. *See* N.T. at 20-21, 23. Rather, Child has "close personal relationships" with his foster family, who provide him with all of his "emotional, medical, educational, developmental, and daily needs." *Id.* at 20. Child has expressed his desire to be adopted by his foster parents to both Case Manager Williams and Child Advocate Mixon. *See id.* at 22, 57-58. Further, Case Manager Williams testified that Child's primary parent child bond is with his foster mother. *Id.* at 20. The trial court specifically credited her testimony.

*See id.* at 64; Trial Ct. Op. at 16. *See also In re Adoption of C.M.*, 255 A.3d at 358.

We also conclude that Mother's reliance on *In re T.F.* is misplaced. In that case, the trial court involuntarily terminated the mother's parental rights to her two children. *See In re T.F.*, 847 A.2d at 740-41. A panel of this Court reversed on appeal, concluding that the trial "court's analysis with regard to the developmental, physical and emotional needs and welfare of the children [was] lacking." *Id.* at 743. Although the trial court concluded that the children were adjusting well to their foster homes, the panel found nothing in the record to support that determination. *Id.* Moreover, the panel noted:

> [T]here is no discussion about bonding or a lack thereof between the children and Mother, or between the children themselves. Nothing was submitted into evidence about the children's health, their schooling and whether or not they are content in their surroundings. Therefore, we have no way of knowing what effect the termination of Mother's parental rights will have on the children. Nor can we conclude that the trial court's conclusion is based on any evidence in the record.

*Id.*

Conversely, in the present case, Case Manager Williams explicitly testified that Child no longer had a bond with Mother, and that Child looked to his foster family for all of his physical and emotional needs. *See* N.T. at 20-21. Further, Child — who was 10 years old at the time of the hearing — expressed to both Case Manager Williams and Child Advocate Mixon his desire to be adopted by his foster family. *See id.* at 22, 57-58. Thus, unlike *In re T.F.*, the trial court's ruling in the case *sub judice* is supported by the

testimony presented at the termination hearing. Accordingly, Mother's second claim fails.

In her final claim, Mother argues that the trial court's order changing Child's placement goal from reunification to adoption was not supported by clear and convincing evidence. Mother's Brief at 19. However, given our disposition affirming the termination decree, Mother's argument concerning the goal charge order is moot. Therefore, we need not review this claim. ***See*** ***In re Adoption of A.H.***, 247 A.3d 439, 446 (Pa. Super. 2021) ("[T]he effect of [a] decision to affirm [an] orphans' court's termination decree necessarily renders moot [a] dependency court's decision to change [a c]hild's goal to adoption."), *appeal denied*, 258 A.3d 1144 (Pa. 2021).

Based on the foregoing, we affirm the decree terminating Mother's parental rights and dismiss as moot Mother's appeal from the order changing Child's permanency goal to adoption.

Termination decree affirmed. Appeal from goal change order dismissed. Jurisdiction relinquished.

Judge Dubow Did Not Participate in the consideration or decision of this case.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>5/31/2023</u>