J-A02039-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF C.R.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.L.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1042 WDA 2025 |

Appeal from the Order Entered July 16, 2025
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  73 of 2024

| | | |
|---|---|---|
| IN RE: ADOPTION OF: D.A.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.L.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1043 WDA 2025 |

Appeal from the Order Entered July 16, 2025
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  74 of 2024

BEFORE:  STABILE, J., MURRAY, J., and BECK, J.

MEMORANDUM BY BECK, J.:                    **FILED: December 30, 2025**

K.L.B. ("Mother") appeals from the orders entered by the Westmoreland County Court of Common Pleas ("orphans' court") terminating her parental rights to D.A.B., born August 2018, and C.R.B., born September 2019 (collectively "Children"), pursuant to 23 Pa.C.S. § 2511(a)(8) and (b).

Because we conclude that the orphans' court did not abuse its discretion in terminating Mother's parental rights, we affirm.

The orphans' court summarized the facts and procedural history of the case as follows:

> The [Westmoreland County Children's Bureau ("the Agency")] first became involved with this family in October 2021, when services were provided to [M.A.B. ("Father")] and Mother due to drug abuse. On March 23, 2023, Children were placed in Agency custody due to Father having overdosed while having custody of Children. By recommendation for adjudication and disposition dated April 14, 2023, to which Father and Mother [(collectively, "Parents")] consented, Children were adjudicated dependent for being without proper care or control and were ordered to remain in the legal and physical custody of the Agency. Mother and Father were both ordered to undergo a drug and alcohol evaluation and comply with recommended treatment; take part in random drug screens; undergo a mental health/psychiatric evaluation and comply with recommended treatment; participate in parenting instruction, which included a parenting curriculum and/or hand-on parenting instruction; and secure and maintain a verifiable source of income.
>
> Permanency review hearings were held on September 27, 2023, April 29, 2024, and January 2, 2025. At the September 27th review, Mother had minimal compliance with the permanency plan. Of the 12 successful drug screens during the period, Mother was positive on 11 of the screens. She failed to participate in mental health treatment. Mother received inpatient treatment from May 4, 2023, through June 19, 2023, but overdosed on September 12, 2023. … Mother made no progress towards alleviating the circumstances which necessitated placement of [Children]. She failed to implement the parenting instruction that was taught, was unable to manage her behavior or regulate her emotions and was not focused on [Children] during visits by taking phone calls and running errands. It was also noted that Mother was indicated for physical abuse against [D.A.B.] in February 2023. …
>
> At the April 29, 2024, review hearing, it was deemed that Mother was minimally compliant with the permanency plan.

Mother was discharged from a drug and alcohol program, however it was unknown whether the discharge was successful. Mother failed to submit to a vast majority of the attempted drug screens. She attended only one of the [sixteen] scheduled parenting sessions, which resulted in the suspension of her visitation until [she] and Father attended eight to [twelve] weeks of parenting instruction. Mother failed to undergo a psychological evaluation which was scheduled on two separate occasions, and she failed to maintain contact with the caseworker. … Both Mother and Father made minimum progress towards alleviating the circumstances which necessitated placement. Mother and Father also failed to attend the two family group decision meetings that were held.

On December 2, 2024, the dependency court found that aggravated circumstances existed as to Mother and Father for failing to maintain substantial and continuing contact with Children for a period of at least six months, as the last visit Parents had with Children was more than 14 months prior on September 18, 2023. The court ordered that no additional efforts were to be made to preserve the family or reunify Children with Parents.

At the third review hearing on January 2, 2025, Mother had moderate compliance with the permanency plan. She was receiving drug and alcohol treatment and mental health treatment at the Gaudenzia House. … Mother made minimal progress toward alleviating the circumstances requiring placement. She failed to participate in offender's counseling and did not have stable and independent housing. She did not have any contact with Children. Father made no progress towards alleviating the circumstances requiring placement. The dependency court also ordered that Parents' visits with Children be suspended because they posed a grave threat to the mental wellbeing of Children.

Petitions for involuntary termination of parental rights were filed against Father and Mother on August 23, 2024. The Agency aver[red] that the parental rights of both Father and Mother should be terminated pursuant to section 2511(a), subsections (2), (5) and (8) of the Adoption Act … and that the developmental, physical and emotional needs of … Children will be best met by terminating the parental rights of Mother and Father pursuant to section 2511(b). An initial fast track hearing was scheduled for October 16, 2024. The October 16th hearing was continued to December 11, 2024, for lack of service on Father due to his whereabouts being unknown. Father and Mother appeared at the

December 11th fast track hearing and stated their intent to contest the involuntary termination. Evidentiary hearings were then held March 13, 2025, March 27, 2025 and May 5, 2025.

Orphans' Court Opinion, 7/16/2025, at 1-4 (unnecessary capitalization and typographical errors omitted).[1]

On July 16, 2025, the orphans' court entered orders terminating the parental rights of Father and Mother. Mother filed timely notices of appeal from the orders.[2] Both Mother and the orphans' court complied with Pennsylvania Rule of Appellate Procedure 1925. Mother raises the following issues for our review:

I.  Whether the [orphans' court] erred in terminating Mother's parental rights under 23 Pa.C.S. [§] 2511(a)(8) when said determination was not supported by clear and convincing evidence establishing grounds for termination?

II. Whether the [orphans' court] erred in its finding that petitioners met their burden pursuant to 23 Pa.C.S. [§] 2511(b) that the best interest of [Children] would be met by terminating Mother's parental rights?

Mother's Brief at 5.

---

[1] We note that the orphans' court appointed Attorney Richard J. Baumgardner as Guardian ad Litem and counsel for Children. Orphans' Court Opinion, 7/16/2025, at 1. The court found that Attorney Baumgardner could represent both the legal and bests interests of Children without conflict. *See id.*; *see also* N.T., 3/13/2025, at 4.

[2] Father also appealed the termination of his parental rights. His appeals are separately pending before this Court.

Mother challenges the termination of her parental rights. In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the [orphans'] court if they are supported by the record, but it does not require the appellate court to accept the [orphans'] court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the [orphans'] court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. Thus, absent an abuse of discretion, an error of law, or insufficient evidentiary support for the [orphans'] court's decision, the decree must stand. We have previously emphasized our deference to [orphans'] courts that often have first-hand observations of the parties spanning multiple hearings. However, we must employ a broad, comprehensive review of the record in order to determine whether the [orphans'] court's decision is supported by competent evidence.

*In re Adoption of C.M.*, 255 A.3d 343, 358-59 (Pa. 2021) (quotation marks, brackets, and citations omitted).

Termination of parental rights is governed by 23 Pa.C.S. § 2511, which requires a bifurcated analysis. *See id.* at 359. "Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in section 2511(a)." *In re C.M.K.*, 203 A.3d 258,

- 5 -

261-62 (Pa. Super. 2019) (citation omitted). If the orphans' court determines the petitioner established grounds for termination under section 2511(a) by clear and convincing evidence, the court then must assess the petition under subsection 2511(b), which focuses on the child's needs and welfare. **In re T.S.M.**, 71 A.3d 251, 267 (Pa. 2013). Clear and convincing evidence is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." **In re C.S.**, 761 A.2d 1197, 1201 (Pa. Super. 2000) (en banc) (quotation marks and citations omitted).

Mother argues that the orphans' court abused its discretion by terminating her parental rights pursuant to section 2511(a)(8). Mother's Brief at 11-14. She asserts that she has remedied the condition that led to the removal of Children because she has been sober since April 24, 2024, which was roughly four months before the filing of the termination petitions in August 2024. **Id.** at 12-13. Mother further asserts that she has "completed many parenting programs with a specific focus on being a parent suffering from addiction," that she has stable housing and employment, and reunification could therefore be "imminent." **Id.** at 13-14.

To terminate parental rights under section 2511(a)(8), the petitioner must prove: (1) the child has been removed from parental care for twelve months or more; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best

- 6 -

serve the needs and welfare of the child. *In re K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008); *see also* 23 Pa.C.S. § 2511(a)(8). Notably, this subsection "does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the placement of the child[]." *Interest of M.E.*, 283 A.3d 820, 832 (Pa. Super. 2022). Rather, "the relevant inquiry regarding the second prong of [section] 2511(a)(8) is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *Id.* (quotation marks and brackets omitted). Further, "[w]ith respect to any petition filed pursuant to subsection [(a)(8)], the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S. § 2511(b); *see also T.S.M.*, 71 A.3d at 255 n.8.

The orphans' court provided the following explanation for its decision to terminate Mother's parental rights under section 2511(a)(8):

> Children were removed from Parents' care by the Agency on March 23, 2023, due to drug use. The Agency filed the involuntary termination petitions on August 23, 2024, which was 17 months after Children had been placed in agency custody.
>
> This [c]ourt finds that the concern for Parents' drug use and addiction continues to exist. While the Court understands that addiction recovery is a lifelong process, neither Parent has established a sufficient period of sobriety to alleviate that concern. Section 2511(b) prohibits this Court from taking into consideration efforts initiated by a parent after the parent has received notice of the termination petition. The termination petition … against Mother was served on September 10, 2024. Therefore, … Mother's efforts through Drug Court are disregarded, as she was

assessed for eligibility on September 20, 2024, which is after she received notice of the termination petition. Even if this [c]ourt were able to consider Parents' current drug treatment, doing so would not overcome the fact that the concern for Parent[s'] drug use continues to exist. Parents have had several failed recovery attempts. Mother is in phase 1 of Drug Court and will not complete the program until October 2026 at the earliest. These facts alone establish that Parents are actively recovering from drug addiction and that risk of relapse is a legitimate concern.

Orphans' Court Opinion, 7/16/2025, at 18-19.

The record reflects that Children have been removed from Mother's care for more than twelve months, as they were removed on March 23, 2023. N.T., 5/5/2025, at 4. While the orphans' court states that Children were removed because of Parents' issues with drug abuse, and that was indeed a primary reason for removal, the record also reflects that Children were removed because there were allegations of abuse against Mother and mental health concerns regarding Mother. *See* Agency Ex. 1 (Recommendation for Adjudication and Disposition, 4/14/2023, at 1-3).

With respect to Mother's drug use, the record reflects that throughout the life of the dependency case, she had numerous positive drug tests or otherwise failed to participate in drug screens. *See* N.T., 3/13/2025, at 74-75. Jean DeFilippis ("DeFilippis") from ARCpoint Labs testified that ARCpoint contracted with Westmoreland County to provide drug testing of parents both before and after Children's removal from Parents' care. *See id.* With respect to Mother's drug screens, DeFilippis stated that ARCpoint unsuccessfully attempted to contact Mother for drug testing 167 times, and that she refused

testing on another 9 occasions. *Id.* at 75. Mother had forty-seven successful drug screens, and of those screens she tested positive twelve times for illicit drugs, including fentanyl, methamphetamine, and cocaine, and sixteen times for marijuana (and she does not possess a medical marijuana card). *Id.* DeFilippis explained that Mother last testified positive for drugs on April 19, 2023, and she did not undergo any drug screens after July 6, 2023, because she was in prison. *See id.* at 76-81.

Angelina Poole ("Poole"), Children's caseworker at the Agency, testified that although Mother successfully completed a drug and alcohol evaluation while she was in prison, and that she has completed inpatient treatment for drug and alcohol abuse, she has only recently made progress towards achieving sobriety. *See* N.T., 5/5/2025, at 7-8, 38-40. Poole stated that Mother's compliance with the permanency plan was typically "minimal compliance, no progress," or "minimal compliance, minimal progress"; she was never more than moderately compliant with the permanency plan and never made more than minimal progress alleviating the reasons for removal of the Children from her care. *Id.* at 32-33. Poole further stated that the circumstances leading to the removal of Children continue to exist, as none of them had been resolved and the Agency still had concerns regarding Mother's mental health, housing, income, drug and alcohol abuse. *Id.* at 39. Poole recognized Mother's "clean date" was April 24, 2024, and expressed that she is "very early in her drug treatment." *See id.* at 39. Poole testified at length

regarding the concerns the Agency's had about Mother's recovery from drug abuse and her ability to parent Children:

> The [A]gency conintues to have drug use concerns for [Parents. Mother] is very early in her recovery[. Parents] have not consistently put parenting instruction into practice. [Mother] in particular has avoided -- continued to avoid taking any responsibility for the reasons that [Children] were removed from the home. [Mother] was indicated on 3/30 of '23 for causing injury to [D.A.B.] after allegedly throwing a shoe at him on 2/3 of '23.
>
> [Parents] did not consistently attend visits. The last visit between [Parents] and [Children] was 9/18 of '23. And because of that inconsistency and the impact on [Children], it was stated that -- it was ordered on April 29th of '24 that [Parents] would need to be consistent in parenting as well as drug screening prior to restarting visits.

*Id.* at 39-40.

According to Poole, Mother has not yet achieved sustained sobriety, nor has she demonstrated the stability necessary to resume visitation with Children, and she had not completed any court-ordered services at the time of the termination hearing. *See id.* at 39-43. Thus, contrary to Mother's claim, there is no indication in the record that reunification is imminent. *See id.* 39-44.

The record supports a finding that Mother largely has not addressed, let alone remedied, the concerns that resulted in Children's removal from her care. The orphans' court therefore did not err in finding clear and convincing evidence to satisfy termination under the first two prongs of section 2511(a)(8).

We next consider whether the record supports the orphans' court's conclusion that there was clear and convincing evidence to terminate Mother's rights pursuant to the third prong of section 2511(a)(8) and section 2511(b). *See In re Adoption of G.W.*, 342 A.3d 68, 89 n.20 (Pa. Super. 2025) (en banc) (explaining that courts regularly conduct the needs and welfare analyses required by both the third prong of section 2511(a)(8) and section 2511(b) together using the same evidence).

Mother argues that the orphans' court abused its discretion by determining that termination of her rights would best serve the developmental, physical, and emotional needs and welfare of Children. *See* Mother's Brief at 15. She baldly asserts that the orphans' court failed to consider the bond she shares with Children, "as well as the fact that [she] did everything the Agency asked of her[,]" as she "completed more than one parenting class, and made efforts to regain sobriety and chose a rehabilitation facility that focused on relationships with your children during and after recovery."[3] *Id.*

Section 2511(b) provides:

---

[3] We note that Mother's argument is severely underdeveloped, as it contains nothing more than bald assertions with no citations to the record or any authority. *See* Mother's Brief at 15. We nonetheless address her claim and decline to find waiver on this basis. *See In re Adoption of J.N.M.*, 177 A.3d 937, 942 (Pa. Super. 2018) (stating that where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived).

> The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511(b).

"[T]he determination of the child's needs and welfare requires consideration of the emotional bonds between the parent and child. The utmost attention should be paid to discerning the effect on the child of permanently severing the parental bond." *T.S.M.*, 71 A.3d at 267 (quotation marks omitted). Our Supreme Court has explained, however, that "the parental bond is but one part of the overall subsection (b) analysis[.]" *Interest of K.T.*, 296 A.3d 1085, 1113 (Pa. 2023). The needs and welfare analysis must also include the consideration of factors such as: "the child's need for permanency and length of time in foster care …; whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability." *Id.* (citations omitted). "These factors and others properly guide the court's analysis of the child's welfare and all [their] developmental, physical, and emotional needs." *Id.* Importantly, "[orphans'] courts have the discretion to place appropriate weight on each factor present in the record before making a decision regarding termination that best serves the child's specific needs." *Id.*

- 12 -

With respect to its needs and welfare analysis, the orphans' court explained:

> This [c]ourt finds that termination of parental rights is in the best interest of Children and will serve all of their needs and general welfare. Ms. Clair testified that when visits were occurring, Children would be excited to see Parents at the beginning and were upset when the visits ended. However, the last visit occurred in September 2023. The inconsistent attendance by Parents at visits proved difficult for Children. Dr. O'Malley testified that Children both acknowledged that Parents were unable to care for them and that they both view their respective foster mothers as their actual [parents].

> Additionally, overwhelming evidence established that Children have strong bonds to their foster mothers. Children are doing extremely well in their care. Dr. Mahady and Ms. McKoy testified regarding the progress they have made while being placed with the foster mothers. The foster mothers have been able to implement practices that assist Children with the therapeutic treatment. Dr. O'Malley, Dr. Mahady and Ms. McKoy all testified that removal of Children from their foster mothers could result a significant setback in their treatment which could have a lifelong effect on their ability to form attachments. This [c]ourt unequivocally finds that the Agency has established by clear and convincing evidence that termination of the parental rights of Father and Mother for adoption by the foster mothers best serves the developmental, physical, and emotional needs of Children.

Orphans' Court Opinion, 7/16/2025, at 20.

The record reveals that to the extent any bond exists between Children and Mother, it is not a healthy bond that is beneficial to Children. *See* N.T., 3/13/2025, at 120. After Children's removal from Parents' care, Mother only attended eight of twenty-one supervised visits with Children. *Id.* at 171. Jena Clair ("Clair") of UPMC Western Behavioral Health at Mon Yough, who supervised Mother's visits with Children and provided Parents with parenting

instruction, testified that although Children were excited to see Mother at the beginning of visits, the inconsistent visitation by Mother was difficult for Children, as Children became concerned for her well-being when she missed visits and had behavioral issues at home and at school if she missed visits. *Id.* at 137-38, 147-48, 159-60.  Clair explained,

> "[Children] really struggled with transitions at the end of visits. Separating was difficult, and this was exacerbated when there were long gaps between visits.  At the beginning of visits, when [Parents] were late, which was fairly often, [Children] would appear to have anxiety, expressed fear that their parents were hurt or not coming.  They were concerned for their overall wellbeing.

*Id.* at 147.

Additionally, Dr. Richelle O'Malley testified that when she began providing therapy for C.R.B. in January 2024, she was defiant, aggressive, struggled to listen, and made statements regarding how her parents were unable to take care of her.  *Id.* at 99-100, 102-03.  She also exhibited "disinhibited engagement," a condition where C.R.B. would engage in inappropriate attention-seeking behavior, as she interacted with anyone just to get attention and possessed no fear of strangers, which raised several safety concerns.  *Id.* at 106.  Dr. O'Malley reported that after approximately a year of working with C.R.B. and her foster mother, she noticed that C.R.B.'s behavior was far more appropriate and controlled.  *Id.* at 107.  Dr. O'Malley testified that in January 2025, she performed a bonding analysis on C.R.B. and her foster mother and noted that C.R.B. was strongly bonded to her foster

parent, the two exhibited spontaneous displays of affection, C.R.B. referred to her foster mother as "mom" or "mommy," and C.R.B. "looked to foster mother as a secure base." *Id.* at 104-05, 107. Consequently, Dr. O'Malley's conclusion was that foster mother was the most appropriate permanency option for C.R.B. *Id.* at 107. Dr. O'Malley further opined that if C.R.B. were removed from her foster mother's care, it would cause C.R.B. substantial long-term damage and inhibit her ability to form secure attachments. *Id.* at 107-08. Dr. O'Mally stated that reunification with Mother would "take quite a bit of work," as she would have to demonstrate her sobriety, remain sober and stabilized, and then complete the appropriate "attachment work," resulting in "an extended process." *Id.* at 108.

Dr. Christine Mahady, who provided complex trauma therapy to C.R.B., echoed Dr. O'Malley's testimony. *See* N.T., 3/27/2025, at 45-46. Dr. Mahady explained that when she began working with C.R.B. her behavior was "feral," as the child was distrustful of authority figures, struggled with listening, had severe tantrums, and could not remain calm. *Id.* at 56. After working with C.R.B. and her foster mother for a time, Dr. Mahady reported that C.R.B. was stabilizing and doing "exceedingly well" at listening to adult instruction and calming herself. *Id.* at 60. Thus, Dr. Mahady opined that C.R.B. resuming visits with Mother would threaten both C.R.B.'s progress and mental well-being. *Id.* at 61-64.

With respect to D.A.B., Dr. O'Malley testified that prior to his placement with his current foster mother, he was often "angry and irritable," but that she noticed a significant improvement, and he expressed "happiness and joy" after he settled in with his current foster mother. N.T., 3/13/2025, at 109-10. Dr. O'Malley indicated that D.A.B. had developed a secure attachment to his foster mother, as he refers to her as "mommy," initiates physical affection with her, and follows her instructions. *Id.* at 111-13, 115-18. She also opined that removal from his foster mother's care would present significant risks to D.A.B. *Id.* at 118-19.

Ashley McKoy ("McKoy"), who provides trauma therapy for D.A.B., testified similarly to Dr. O'Malley. *See* N.T., 3/27/2025, at 8-9. McKoy stated that D.A.B. made significant progress with his foster mother and that reunification or resuming visits with Parents would be extraordinarily risky and potentially counterproductive. *Id.* She also observed that D.A.B. and foster mother shared a "very close" connection and he looked to her for emotional stability, connection, and reassurance. *Id.* at 16. McKoy opined if D.A.B. were removed from foster mother's care, it would be destabilizing to his emotional wellbeing and that he would likely return to his aggressive behaviors quickly. *Id.* at 18-19.

Based on the record before us and the standard of review we must employ, we discern no abuse of discretion in the orphans' court's conclusion that Children are bonded to their foster parents, the foster parents best meet

their needs and welfare, and that Children will not be irreparably harmed by terminating Mother's parental rights.   Accordingly, we conclude that the orphans' court did not err in determining that Children's developmental, emotional, and physical needs and welfare are best met by terminating Mother's parental rights under the third prong of section 2511(a)(8) and 2511(b).

As the orphans' court's determination pursuant to section 2511(a)(8) and (b) is supported by the record, we must affirm the orders terminating Mother's parental rights to Children.  ***See C.M.***, 255 A.3d at 358-59.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 12/30/2025